2024 IL App (2d) 230255
No. 2-23-0255
Opinion filed May 10, 2024

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE VILLAGE OF LINCOLNSHIRE, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff-Appellee, | ) | |
| | ) | Nos. 21-DT-703 |
| v. | ) | 21-TR-23260 |
| | ) | |
| DANIEL OLVERA, | ) | Honorable |
| | ) | Bolling W. Haxall III, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Presiding Justice McLaren and Justice Mullen concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a bench trial, defendant, Daniel Olvera, was found guilty of driving under the influence (DUI) of drugs, namely cannabis, under section 11-501(a)(4) of the Illinois Vehicle Code (Vehicle Code) (625 ILCS 5/11-501(a)(4) (West 2020)).[1] The trial court placed him on 12 months of supervision. On appeal, defendant contends that his conviction must be reversed because (1) he was improperly prosecuted for a Vehicle Code violation by the Village of Lincolnshire (Village)

---

[1]Defendant was also found guilty of improper traffic lane usage (625 ILCS 5/11-709(a) (West 2020)) and two ordinance violations. His arguments on appeal are confined to the DUI (cannabis) conviction.

without a showing on the record of written permission to prosecute from the Lake County State's Attorney and (2) the evidence was insufficient to prove him guilty beyond a reasonable doubt of DUI (cannabis). We affirm.

¶ 2                                    I. BACKGROUND

¶ 3     On May 6, 2021, defendant was arrested and charged with DUI (cannabis) (*id.*), among other offenses.

¶ 4     A bench trial was held on January 9 and January 20, 2023. The evidence established that, on May 6, 2021, defendant was a 16-year-old sophomore at Stevenson High School and his seventh-period class was driver's education. On that day, Scott Peckler was serving as a substitute driving instructor. Peckler had retired five years earlier after teaching special education and driver's education for 30 years. Peckler was assigned to take defendant and a female fellow student out for on-the-road driving instruction. Defendant was scheduled to drive; the female student was scheduled to observe from the back seat.

¶ 5     Peckler testified that it took several minutes to walk from the classroom to the vehicle's location. During the walk, defendant was hiccupping, and Peckler asked him if he was okay "because a lot of kids at that point in time are very nervous." Peckler could not recall defendant's level of driving experience but agreed that the semester was nearing its end. Peckler did not notice anything else unusual about defendant during the walk to the vehicle.

¶ 6     Peckler testified that defendant drove for about 40 minutes, during which Peckler made the following observations. When defendant was backing the vehicle out of the parking space, "he had a little difficulty maneuvering the car," and Peckler "had to help him a little bit." Defendant did not look over his shoulder or check the car's rearview camera. As they proceeded down the road, Peckler instructed defendant to turn left onto a street with two lanes in each direction. As defendant

turned left into the inside lane, he veered into the outside lane, and Peckler "grabbed the wheel and put him back because there was a car approaching on [the] right." Defendant was "veering left and right" as he drove down the road, and Peckler thought "that he was probably a little nervous driving." Peckler "grabbed the wheel several times and put [defendant] straight back into [the] lane."

¶ 7 Peckler told defendant that they would travel through a roundabout and explained how to do so. As they were driving toward the roundabout, defendant "kept talking back to the passenger," and Peckler told defendant to concentrate on driving. When defendant entered the roundabout, he "veer[ed] up towards the curb in the circle," and Peckler "had to grab the wheel" to redirect him. Peckler directed defendant through the roundabout a second time and again had to grab the wheel.

¶ 8 After defendant exited the roundabout and drove a short distance, Peckler directed defendant to turn right at an upcoming stop sign. Peckler had to use the brake on his side of the vehicle to stop the car because defendant "wasn't going to come to a complete stop." Peckler had to use his brake a second time when defendant approached a stoplight. At this point, Peckler believed that defendant was "very nervous while he was driving." He stated: "I've done this for many years, and I've seen students drive all over the place because they're afraid. They don't practice at home. That's a big factor."

¶ 9 Peckler testified that, as they headed back toward the roundabout, defendant was "a little nervous driving, weaving a little bit." Defendant still had "a little difficulty" navigating the roundabout; he was "weaving left and right," but Peckler did not have to grab the steering wheel at this point. Defendant approached a red light. As the light turned green, Peckler observed defendant's "head go down" and asked him if he was okay. Defendant responded that "he's been tired, he hasn't slept." Defendant then proceeded to make a right turn "a little erratically."

¶ 10    As defendant drove back to the school, he kept talking to the female student. Peckler tried to keep defendant "directed towards the task at the time." Defendant was "weaving," and Peckler "had to grab the wheel several times." Peckler testified: "I just felt that it could have been nerves." When they returned to school, defendant had a "little bit" of difficulty parking the vehicle; Peckler "had to help him straighten out the car and put it into the parking space." Peckler spoke with the director of driver's education and told her, "[T]here's something going on here, I think you should check this out."

¶ 11    On cross-examination, Peckler testified that he had not met defendant until the day of the drive. Although Peckler would have seen defendant's driver's education record, including how many drives he had completed, Peckler could not recall if this was defendant's first drive. He believed that Stevenson High School required 6 hours of driving time and that the State required an additional 50 hours. Peckler testified that he had been around people who had consumed cannabis and was familiar with its odor. Peckler would not have allowed a student to drive if he believed that the student was "high." Peckler did not detect the odor of cannabis or any other unusual odor emanating from defendant. Peckler noted that defendant's behavior before the drive was "a little foolish," but nothing that would have caused Peckler to bar him from driving. When defendant was talking to the female student in the vehicle, Peckler noticed "a little slur" but thought it could be due to fatigue.

¶ 12    On redirect examination, Peckler stated that his concerns about defendant increased "towards the end" of the drive. At that time, he believed "[t]here was something wrong here," but he could not "pinpoint it."

¶ 13    Sara Rogers testified that she has been a dean of students at Stevenson High School for the past eight years. Including previous employment, she has been a dean of students for

approximately 15 years. Before that, she worked as an English teacher for four years. Students are typically assigned to one dean throughout high school. Defendant had been assigned to her "caseload" since freshman year. Before May 6, 2021, Rogers had "[q]uite a bit of contact" with defendant. She worked with defendant "on a couple different situations" when he was a freshman and in the fall of his sophomore year. She testified that she knew him "well."

¶ 14    Rogers testified that, on the day in question, she was asked to report to the driver's education room because it was suspected that a student was "driving under the influence." Courtney Bresnan, who was in charge of driver's education, relayed to her what Peckler had reported about defendant. After speaking with Bresnan, Rogers saw defendant in the hallway. She testified: "His speech was slow. He was confused. You know, he couldn't respond quickly to questioning. So I was concerned. I agreed with the recommendation that he needed some assistance, and I walked him to the nurse's office." She "decided that he needed to be checked out medically." She further testified: "He was slow to walk—slow at walking, slow at responding, slow to speech, slurry words, not a lot of enunciation as we were kind of walking toward the nurse's office." Rogers testified that she had previously spoken with defendant "over 30, over 40" times before May 6, 2021. She had seen him "every day" and had "interacted with him quite a bit, even during the remote-learning time." As they walked to the nurse's office, Rogers noticed that defendant was "just slow, meandering, not moving at a typical pace that he had in previous experience." Defendant was with the nurse for less than 10 minutes before the nurse spoke with Rogers about defendant. The nurse reported that defendant was "really nervous, really upset, worried, and slow in his speech still."

¶ 15    Rogers testified that she then interviewed defendant. Defendant told her that "he had been up all night long because he had been using marijuana in the evening hours and had been caught

by his mother and so he hadn't been sleeping well." Because of this admission, Rogers called David Schoenfisch, another dean of students at Stevenson, and asked him to conduct a student search of defendant. Schoenfisch came "right away" and searched defendant. Schoenfisch found an object in defendant's wallet that was "skinny, white, rolled." When Rogers asked defendant what it was, he told her that it was a "marijuana cigarette." Based on her experience, Rogers concluded from the appearance and scent of the object that it was indeed a "marijuana cigarette." Rogers then called Officer Thomas Beale, a Village police officer employed by Stevenson High School as a school resource officer. Rogers reported to Beale that she "suspected that [defendant] was under the influence and certainly in possession of marijuana."

¶ 16    Rogers testified that Beale left "to go write the tickets." Beale returned less than 15 minutes later and stated that he wanted to conduct field sobriety tests (FSTs) on defendant. Rogers, Beale, and defendant went outside to a "quiet" and "isolated location" where there was a dining tent sent up "for pandemic reasons." There, Beale conducted "a balance assessment" on defendant. Rogers could not recall "if it was on one foot or two feet, but [defendant] kept falling over, and that's what I saw." She explained: "He'd lose his balance and then have to catch himself with his other foot or with a hand even. He just wasn't able to maintain his balance." At some point, Beale stopped the test. Beale "expressed concern" and informed defendant that he would be arrested. Defendant left with Beale. Rogers did not see defendant again that day.

¶ 17    On cross-examination, Rogers testified that defendant said he had gone to bed "like 3:00 a.m." the night before. He claimed that "his mom had caught him for smoking pot that evening, that night," but he "didn't specify the time" she caught him.

¶ 18    Thereafter, the trial court conducted the following examination of Rogers:

"Q. [(THE COURT)] So just to clarify what you just said, so during your questioning of [defendant], you didn't ask him what specific time he had last used marijuana?

A. No.

Q. Did you ask him if he was still feeling the effects at the time he was meeting with you?

A. Yes, and he said that he must be.

Q. When was that conversation? Was that with the nurse or with the officer later?

A. That would have been with me. So between the nurse and the officer. You know, we always ask students why do you think your speech is slurred, why do you think you feel this way. He said, oh, because I got high last night, and I actually got busted by my mom.

Q. Okay. But—

A. He felt he was feeling the effects still.

Q. Okay. But he—so there's a—I just want to make sure I differentiate.

A. Sure.

Q. Did he indicate he was feeling, as you put it, the term high last night or at the time that he was talking to you?

A. At the time he was talking to me.

Q. Okay. Did he say anything else about any physical effects at that time?

A. Exhaustion and emotional effect. He was worried. He was scared.

Q. Okay. Based on everything you had observed and your conversations with [defendant], did you believe that at that moment he was under the influence of cannabis?

A. Absolutely.

Q. Is it possible that was just due to his staying up all night, or do you think it was—

A. No, I think he was under the influence.

Q. Okay. And what's the basis of that?

A. Life experience, job experience.

Q. I mean, what about him specifically do you think led you to believe that?

A. His response was extremely emotional and uncontrolled and indicative of being under the influence, and he indicated to me that he had been under the influence recently and that he was under the influence.

Q. But you don't think—and, look—I mean, you have so much experience with kids—

A. Sure.

Q. —in fact, with [defendant] in particular. You don't think that could be—that emotional response could be because his mom busted him last night? You think it's—

A. No.

Q. —because he was still under the influence?

A. I think it was because he was still under the influence."

¶ 19    On redirect examination, Rogers could not recall whether defendant told her that he went to bed at 3 a.m. or that he fell asleep at 3 a.m. Using an e-mail that she sent to Beale to refresh her recollection, Rogers testified that defendant told her "[t]hat he had been caught smoking marijuana by his mom and then had stayed up until 3:00 a.m. because he was under the influence and worried and disappointed at disappointing his mother."

¶ 20    On recross-examination, Rogers conceded that her e-mail to Beale did not indicate that she observed defendant to have bloodshot eyes. Her e-mail did indicate that defendant exhibited some

slow speech and slurred words. The e-mail also indicated that defendant denied recent drug use but admitted that he had smoked marijuana the previous evening.

¶ 21    Schoenfisch testified that he was a dean of students at Stevenson High School. His first contact with defendant was on May 6, 2021. He received a call from Rogers that she needed assistance with a student. When he arrived at Rogers's office, he was asked to search defendant, who was present and sitting quietly. Schoenfisch's search uncovered "a marijuana joint" in defendant's wallet. Schoenfisch described it as "a rolled-up piece of paper that looked like it had been lit at one point." Schoenfisch did not recall if there was an odor. When Schoenfisch asked defendant what the item was, he responded "[t]hat it was marijuana."

¶ 22    On cross-examination, Schoenfisch testified that he did not notice any balance issues when defendant stood up to be searched. Schoenfisch did not recall whether defendant had any issues with his manual dexterity. The item Schoenfisch located was about two inches long and looked like it had been lit at some point, but he could not say when it was lit.

¶ 23    Beale testified that he has been a police officer for 26 years and the school resource officer at Stevenson High School since August 2020. While in the police academy, he received training in "DUI detection." He subsequently had "additional training" in DUI detection. He explained: "Most of it has been in-house [training] in dealing with DUI detection through [FSTs]. I've had a refresher, not really much training in regards to DUI detection with drugs." He testified that, "in addition to DUI detection training, [he] had training in detecting individuals under the influence of drugs besides alcohol." During his time as a police officer, he has encountered people under the influence of drugs besides alcohol "approximately over 100" times.

¶ 24    Beale testified that, on May 6, 2021, he responded to Rogers's request to meet her at the nurse's office and saw defendant. Rogers told Beale that there had been a report that defendant

was "not acting right" during driver's education, that "they believed he could be possibly under the influence of drugs," and that a "cigarette of cannabis" was found in defendant's wallet. Beale testified that he had "been trained in regards to DUI detection in regards to detecting the odor within a car," and he stated that the cigarette "smelled like cannabis." Defendant admitted that the cannabis was his and that he had been "smoking earlier—the night before." Beale testified regarding his observations of defendant. He stated: "I noticed his speech was slurred. He seemed to be confused, was not answering questions or couldn't remember some of the questions that were being asked to him. He also appeared very tired, lethargic." Upon learning that defendant had been driving and that his "poor driving led [Peckler] to believe that [defendant] was under the influence of drugs," Beale left to speak with Bresnan. Less than 15 minutes later, after speaking with Bresnan, he returned to the nurse's office to conduct FSTs on defendant. Beale testified that the refresher courses, to which he had previously referred, included instruction on administering FSTs.

¶ 25    Beale testified that he and Rogers brought defendant to a tent outside the school so that Beale could privately conduct the FSTs. He received the call from Rogers a little before 2 p.m., and they got to the tent a little before 3 p.m. Before beginning the tests, Beale ensured that there were no obstacles in defendant's way and that there were no other people in the tent. He ensured that the surface, made of "smooth pavers," was flat and debris-free. Defendant confirmed that he had no injuries or other issues that would impact his performance on the tests.

¶ 26    Beale testified that the first test he asked defendant to perform was the "Romberg balance test." Beale explained:

"Basically you will stand with your feet together, your hands down at your sides. You will then raise your chin so it's pointing upwards. You will then close your eyes, and then you

will stand there, and then you will count or tell me when 30 seconds is up, and then you will stop the test."

Beale demonstrated the test and asked defendant if he understood his instructions and demonstration. Defendant indicated that he did.

¶ 27    When asked about defendant's performance on the test, Beale stated:

"Well, first, he had difficulty placing his feet in the correct position and getting them aligned so he could keep his balance. In fact, one of the times when he was doing that, he actually lost balance and had to grab a chair that was nearby in order to prevent himself from falling maybe.

Then once he was properly aligned, his feet and he was in proper position, he attempted the test three times. During the three times he would sway in all directions. He would have a hard time keeping his eyes closed. He would lower his chin. And then he would also stop the test each time prior to 30 seconds."

Beale described defendant's swaying motion as "a circular pattern, kind of left to right, front to back." Defendant was swaying "in all directions approximately 3 to 4 inches." Beale kept track of the time with his phone. Although he did not document when defendant stopped the test, he knew it was earlier than 30 seconds. Defendant attempted the test three times, and Beale observed the same performance on each attempt. Beale described defendant's balance as "poor, poor."

¶ 28    Beale testified that he next asked defendant to perform the "finger-to-nose test." Beale instructed defendant to raise both arms to the side at about shoulder height, place his feet together, tilt his head back, extend his index fingers, and then touch his nose with whichever index finger Beale directed. In addition to providing verbal instructions, Beale demonstrated the test. Beale asked defendant if he understood what he was supposed to do, and defendant responded

affirmatively. Beale testified that it took defendant a couple of attempts to get into the correct position. Beale then asked defendant to bring his right index finger to his nose. When defendant did so, "he went towards his nose and ended up hitting the middle of his check." When asked to use his left hand, defendant "hit himself in his left eyeball." When next asked to use his right hand, defendant "hit his nostril." Beale observed that defendant "was swaying to the right and left approximately 3 to 4 inches and having difficulty standing still." His balance was "poor." Beale stopped the test because he did not want defendant to fall.

¶ 29    Beale informed defendant that he would be arrested for DUI. As they walked to Beale's squad car, Beale noticed that defendant was not walking straight. "[Defendant] would walk kind of like in a serpentine every now and then. It just didn't appear to be walking normal." Beale contacted fellow Village police officer Barrett Weadick and asked him to meet them at the police station. Beale wanted Weadick to perform additional FSTs in the booking room because Beale "didn't get a chance to record any [FSTs] in the *** tent" and Weadick had more training and experience in "DUI enforcement with drugs." Weadick met Beale and defendant when they arrived and had defendant perform additional FSTs. In addition, Beale asked defendant to submit to a blood test, but defendant said no. In Beale's opinion, defendant was "under the influence of drugs or cannabis."

¶ 30    On cross-examination, Beale testified that he could not tell if the cigarette found on defendant had been smoked. He further testified that defendant did not smell like cannabis.

¶ 31    Weadick testified that he has been a patrol officer with the Village for almost four years. His police academy training encompassed "traffic enforcement and DUI detection," including the administration of FSTs. He subsequently received additional training in "detecting people under the influence of cannabis." As part of this training, he attended "Drug Recognition Expert, DRE,

school." He has "completed numerous hours of continuing education in the fields of impaired driving enforcement and how drugs affect the body."

¶ 32    Weadick testified that, on May 6, 2021, he performed FSTs on defendant in the booking room at the police station. Those tests were video recorded, admitted into evidence, and played for the trial court.

¶ 33    In the video, Weadick began by advising defendant that they were going to do a few quick tests. Defendant denied that he had any physical or balance issues that would interfere with the tests, and he denied taking any prescription medicine.

¶ 34    For the first test, Weadick asked defendant to follow Weadick's finger with his eyes, without moving his head, as Weadick moved his finger to the left and right several times. Weadick repeated the test, moving his finger to the left and right several times. While conducting the test, Weadick reminded defendant to keep following his finger and told him once to keep his head still. Weadick next asked defendant to again follow his finger with his eyes as he moved the finger up and down in front of defendant.

¶ 35    Weadick next instructed defendant to put his right foot in front of his left foot, while keeping his hands at his side. As defendant attempted to do so, he wobbled to his left, grabbed a nearby counter for support, and stepped out of position. He had some trouble getting back into position. Weadick then instructed defendant to take nine heel-to-toe steps. Defendant took nine such steps, wobbling a bit on his eighth step. After his ninth step, he turned and took another nine steps back to his starting position.

¶ 36    Weadick next instructed defendant to stand with his feet together and his arms at his side. He asked defendant to raise one foot off the ground, keeping his arms at his side, and count aloud. Defendant counted to 27 before Weadick stopped him.

¶ 37    For the next test, Weadick instructed defendant to follow Weadick's finger with his eyes as Weadick moved it around in front of defendant, bringing it toward defendant's nose. Weadick once reminded defendant to keep his head still.

¶ 38    Weadick next instructed defendant to stand with his feet together, place his arms at his side, tilt his head back, and close his eyes. Weadick explained that, at Weadick's signal, defendant should wait for 30 seconds and then tilt his head forward and say stop. Defendant had some trouble understanding the instructions, but he ultimately was able to perform the test. Defendant stopped the test at about 39 seconds.

¶ 39    For the final test, Weadick asked defendant to stand with his feet together and his arms at his side. He instructed defendant to tilt his head back, close his eyes, and point his fingers. He then directed defendant to touch the tip of his finger to the tip of his nose, using whichever arm Weadick instructed him to use. Weadick called out the directions in this order: left, right, left, right, right, left. Weadick said "miss" four times during the test. Defendant appeared to touch the side of his nose rather than the tip. Also, at one point, when told to use his right arm, defendant started to move his left arm but then corrected himself.

¶ 40    After the video ended, the State asked Weadick if, after conducting the tests, he was able to determine whether defendant was under the influence of cannabis. Weadick replied that he "determined that [defendant] was under the influence." He further stated: "Barring a full DRE drug influence evaluation I cannot determine the category or categories. So I determined that he was impaired, but that is as far as I can go."

¶ 41    On cross-examination, Weadick testified that defendant did not smell like burnt cannabis and that his speech was "[n]ear normal." He never had to ask defendant to repeat himself. Defendant did not need help walking around the police station.

¶ 42 The trial court also examined Weadick. The court asked Weadick what he found significant about defendant's performance during certain portions of his testing. As for the modified Romberg balance test, Weadick stated: "[T]he distorted estimation of time[,] the distorted internal clock as [defendant] stopped the 30-second test at 39 seconds and also the very pronounced sway that we saw as he was performing the test." As for the finger-to-nose test, Weadick stated:

> "[O]nce again, the very pronounced sway, his difficulty understanding the instructions that I gave for it, as well as him missing his touching the tip of his finger to the tip of his nose and then when he confused—when he brought up the incorrect arm when I gave him the instruction for right and left."

As for the one-leg-stand test, Weadick stated: "[H]im leaning to his left and then also the sway that he had during the—." The court interrupted, and the following colloquy occurred:

> "Q. [(THE COURT)]: And, obviously this is a different—what you're looking for is different than *** for the alcohol-impairment issues.
>
> If you were scoring this for alcohol, how would he have performed on the one-legged stand for that? Was—were there sufficient clues that you would normally say that's [*sic*] indicates impairment for alcohol as well, or is it just different for cannabis?
>
> A. So I would say it absolutely indicated impairment—
>
> Q. Okay.
>
> A. —yes. If we were to score it, it would absolutely indicate impairment."

¶ 43 On recross-examination, Weadick agreed that, during the finger-to-nose test, when Weadick instructed defendant to use his right arm twice in a row (rather than continuing the left, right, left, right pattern), defendant immediately corrected himself as he began to use his left arm.

¶ 44 Following Weadick's testimony, the Village introduced into evidence a 30-minute video "compilation from security cameras at Stevenson High School," which showed defendant walking from the driver's education classroom through various hallways to the parking lot where the driver's education vehicles were located. It also showed defendant driving away from and back to campus and parking the car. The trial court viewed the video.

¶ 45 The Village rested. Thereafter, defendant moved for a directed finding, which the trial court denied. Defendant rested without presenting evidence.

¶ 46 The trial court found defendant guilty of DUI (cannabis). In doing so, the court made the following comments. The court first noted that, although defendant did "very well" on the FSTs at the police station, there was "one moment *** where the defendant los[t] his balance, reache[d] out with his left hand and scabs [*sic*] the sink to steady himself." The court also noted that it did not find defendant's refusal to take a blood test "significant," given that defendant admitted to having smoked marijuana the previous evening and that he "might think it would still be in a test performed the next day."

¶ 47 The trial court next addressed defendant's driving. The court acknowledged defense counsel's argument that defendant drove poorly simply because he was a novice driver. The court rejected that position:

"That could be true to a certain degree. It could also be a [*sic*] true that it's a novice driver who has—or at that time was under the influence of cannabis. And I think it can also be true that any amount of cannabis could potentially affect the driving of a new driver in a more significant manner than it might a more experienced driver in the same way that different amounts of cannabis affect different people differently, it is also possible that the

same amount of cannabis could affect different drivers differently based on their relative experience."

The court acknowledged Peckler's testimony[2] that he initially attributed defendant's poor driving to the fact that he was a young driver. The court credited Peckler's initial assessment, which was based on his "decades" of experience as a driving instructor and witnessing the effect of nerves on a beginning driver's performance. But the court noted that Peckler's impressions changed during the drive: "But at the end of the defendant's driving and having seen the defendant before and after, [Peckler] was concerned enough to bring it to the attention of the school that he had concerns that [defendant] was under the influence."

¶ 48     The trial court next noted the video from the school that showed defendant walking through various hallways, along with Peckler and another student, to the driver's education vehicle outside. The court noted that "the line down the center of the hallway" allowed for a "better than usual view" to observe defendant walking. The court observed: "[Defendant] is all over the hallways. He is stumbling back and forth. He repeatedly nearly walks into kind of pieces of wall that seemed to jet out." And further: "[A]t one point I think he ran into the lockers and there's another where he almost hits a table."

¶ 49     The trial court next found Rogers's testimony to be "significant." The court noted that Rogers knew defendant well. Rogers was familiar with "how [defendant] talked, how he walked, and she had concern[s] that he was under the influence." The court also remarked that it had asked Rogers whether she could attribute defendant's behavior to his having been "up all night," as he claimed. Her response, the court noted, was "no, I think he was under the influence."

_____

[2]Periodically throughout the transcript, the word "money" inexplicably appears in place of "Peckler."

¶ 50   The trial court concluded:

"[T]he question for me is whether or not the defendant was under the influence of cannabis to a degree which rendered him incapable of safely driving. I believe he was. I believe [Peckler's] testimony about [defendant's] driving may also have been due somewhat to his inn experience [*sic*] but was also due to the cannabis that the defendant had at some point prior to driving that vehicle. I would note that the [FSTs] conducted at the school, the school resource officer described but also Dean Rogers described that she observed [defendant] nearly falling over and having to put his foot down. What seems to make sense to me is by the time he was at the police station, the effects of the cannabis to a certain degree had dissipated somewhat. Certainly to where he was able to perform those [FSTs] better than he did at the school. It may also have been a situation where the police booking room is a more controlled environment, you know, no wind, no weather, better floor, those also could have had some impact. But when I view [defendant] walking through those hallways and one of the officers today said something that something just wasn't right and that's—that's what I observed. There's something about [defendant] that wasn't right. And while I do believe fatigue and emotion could have played some part in that, I believe cannabis also did and did so to a degree which rendered [defendant] incapable of safely driving."

¶ 51   After he was sentenced, defendant filed this timely appeal.

¶ 52                              II. ANALYSIS

¶ 53                    A. The Village's Authority to Prosecute

¶ 54   Defendant first contends that, because he was prosecuted for DUI (cannabis) under the provisions of the Vehicle Code (as opposed to a Village ordinance), the Village was required,

under section 16-102(c) of the Vehicle Code (625 ILCS 5/16-102(c) (West 2020)), to obtain written permission from the State to prosecute the case.[3] According to defendant, because the record does not contain evidence of the required authorization, it was improper for the Village to prosecute him, and thus, his conviction must be reversed. Defendant acknowledges that he has forfeited the issue by failing to raise it below, but he asserts that it is reviewable under the second prong of the plain error rule.

¶ 55    In response, the Village argues that it *did* have authority to prosecute. In support, it included in its brief's appendix a copy of a letter from Lake County State's Attorney Eric F. Rinehart, granting the Village's attorney authority to prosecute Vehicle Code violations occurring in the Village (and certain other municipalities). Moreover, the Village argues that, under *People v. Wiatr*, 119 Ill. App. 3d 468 (1983), it was not required to provide record proof of its authority to prosecute. Finally, it argues that, in any event, defendant has forfeited the issue and that the issue is not subject to plain error review.

¶ 56    Initially, we note that we do not consider the Village's contention that it had written permission to prosecute, because it improperly relies on a document outside of the record in support. See *In re Marriage of Pavlovich*, 2019 IL App (1st) 172859, ¶ 14 ("To the extent that documents or allegations relied on *** are not contained in or supported by the record on appeal, we will disregard them in addressing [the] contentions on appeal."); *People v. Wright*, 2013 IL App (1st) 103232, ¶ 38 ("The inclusion of evidence in an appendix is an improper supplementation of the record with information *dehors* the record."); Ill. S. Ct. R. 342 (eff. Oct. 1, 2019).

---

[3]The parties do not dispute that defendant was charged with and convicted of DUI (cannabis) under the Vehicle Code.

¶ 57    We next address defendant's forfeiture. As noted, defendant concedes that he has forfeited the issue by failing to raise it below. See *People v. Cregan*, 2014 IL 113600, ¶ 15 ("To preserve an issue for review, a party ordinarily must raise it at trial and in a written posttrial motion."). However, defendant invokes the plain error rule. See Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."). A defendant invoking the plain error rule must demonstrate that a clear or obvious error occurred and that either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) "the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Moon*, 2022 IL 125959, ¶ 20. Under both prongs, a defendant bears the burden of persuasion. *Id.* Here, defendant seeks relief under the second prong. Our review is *de novo*. *Id.* ¶ 25.

¶ 58    "The first analytical step under the plain error rule is to determine whether there was a clear or obvious error." *Id.* ¶ 22. Not all errors, even ones that might demand reversal had the argument been preserved, constitute clear or obvious errors for purposes of the plain error rule. *People v. Hammons*, 2018 IL App (4th) 160385, ¶ 17. It is not enough that the defendant identifies "arguable issues that could have been raised in the trial court." *Id.* "Plain-error review is reserved for errors that are clear or obvious based on law that is well settled at the time of trial ***." (Internal quotation marks omitted.) *People v. Rollins*, 2024 IL App (2d) 230372, ¶ 16.

¶ 59    After establishing a clear or obvious error, a defendant seeking relief under the second prong must establish that the error is equivalent to "structural error." *People v. Jackson*, 2022 IL 127256, ¶ 28. "[I]n analyzing whether an error is structural under the second prong of the plain error rule, we often look to the type of errors that the United States Supreme Court has identified

as structural to determine whether the error being considered is comparable." *Moon*, 2022 IL 125959, ¶ 30. "The structural errors identified by the Supreme Court include a complete denial of counsel, denial of self-representation at trial, trial before a biased judge, denial of a public trial, racial discrimination in the selection of a grand jury, and a defective reasonable doubt instruction." *Id.* ¶ 29. Structural errors are ones that "affect the framework within which the trial proceeds, rather than mere errors in the trial process itself." *Id.*

¶ 60    Given the above guidelines, we must first consider whether the Village's prosecution of defendant for DUI (cannabis) under the Vehicle Code without a record showing of its authority to prosecute is clear or obvious error. There is no question that the Village must have written permission from the state's attorney to prosecute violations of the Vehicle Code. Section 16-102(c) of the Vehicle Code (625 ILCS 5/16-102(c) (West 2020)) states: "The State's Attorney of the county in which the violation occurs shall prosecute all violations except when the violation occurs within the corporate limits of a municipality, the municipal attorney may prosecute if written permission to do so is obtained from the State's Attorney." However, the plain language of this provision does not impose an affirmative duty on a municipality to submit, at any time, proof of its authority to prosecute.

¶ 61    In *Wiatr*, the defendant, like defendant here, argued for the first time on appeal that his convictions of Vehicle Code violations must be reversed because the village attorney prosecuted him and the record did not disclose proof that the village attorney had permission from the state's attorney to prosecute him. *Wiatr*, 119 Ill. App. 3d at 470, 472. We concluded that the defendant "waived"[4] the argument by failing to raise it below. *Id.* at 473. Nevertheless, we stated: "If the

---

[4]Although courts often use the terms "waiver," "forfeiture," and "procedural default"

authority to prosecute was, in fact, delegated by the State's Attorney, the statutory requirement has been met and the village was the proper prosecuting party." *Id.* at 472. We further stated:

> "Where they have chosen to delegate authority to prosecute *** Vehicle Code violations to a municipality, it is probable the State's Attorneys of the various counties do so in more than one way. Some may give such permission on a case by case basis; others do so by a general letter of permission to the municipality. [Citation.] To require, as urged by [the] defendant, that the municipal attorney offer proof in the record of each case that prosecutorial permission has been given by the State's Attorney appears to be an unreasonable and unnecessary burden to impose on the municipal attorneys and State's Attorneys and would also unduly burden the record keeping responsibilities of the circuit clerks." *Id.* at 472-473.

We acknowledged *Village of Hoffman Estates v. Spychalski*, 33 Ill. App. 3d 83, 84 (1975) (*per curiam*), where the Village of Hoffman Estates appealed from the trial court's dismissal, for want of prosecution, of the Village's prosecution of the defendant for a Vehicle Code violation. The First District dismissed the appeal because the record did not disclose that the municipal attorney was given permission to prosecute the violation. *Id.* at 85-86. We expressly declined to follow *Spychalski*. *Wiatr*, 119 Ill. App. 3d at 473.

---

interchangeably, "waiver" is the voluntary relinquishment of a known right, whereas "forfeiture" or "procedural default" means that an issue could have been raised but was not. See *People v. Blair*, 215 Ill. 2d 427, 443-44 (2005); *People v. Turner*, 2012 IL App (2d) 100819, ¶ 26. In *Wiatr*, although we used the term "waived," the substance of our decision made clear that we found that the defendant forfeited the issue. *Wiatr*, 119 Ill. App. 3d at 473.

¶ 62    Defendant acknowledges *Wiatr* but directs us to our later decision in *Village of Bull Valley v. Zeinz*, 2014 IL App (2d) 140053, and to *People v. Herman*, 2012 IL App (3d) 110420.

¶ 63    In *Zeinz¸* the defendant was charged with two violations of the Vehicle Code and prosecuted by the Village of Bull Valley. *Zeinz*, 2014 IL App (2d) 140053, ¶ 1. At his bench trial, after the Village rested, the defendant moved for a directed finding based on section 16-102(c) of the Vehicle Code, arguing that the prosecution was not authorized because the Village failed to prove that the offense occurred " 'within the corporate limits of a municipality.' " *Id.* ¶ 7 (quoting 625 ILCS 5/16-102(c) (West 2012)). The trial court denied the motion. *Id.* ¶ 9. The defendant reiterated his claim of unauthorized prosecution both in his closing argument and, after being found guilty, in his motion to reconsider. *Id.* ¶¶ 10-11. At the hearing on the motion to reconsider, the Village produced evidence of a letter from the McHenry County State's Attorney, authorizing the Village to prosecute. *Id.* ¶ 11. The court denied the motion to reconsider, finding that, because the officer had the authority to stop the defendant for Vehicle Code violations " 'that were observed *** within the Village but occurred outside of the Village,' " the Village impliedly had the authority to prosecute those charges. *Id.* ¶ 12.

¶ 64    We reversed on appeal. *Id.* ¶ 24. We held that the trial court's conclusion improperly "read in an exception to section 16-102(c)'s unambiguous limitation on the Village's authority." *Id.* ¶ 16. We next considered the Village's argument that the evidence was sufficient to prove that the DUI occurred within its corporate limits, and we found that it was not. *Id.* ¶ 19-21. Thus, we concluded that the Village lacked the authority to prosecute:

"Under the case law, a municipality relying on a grant of authority to prosecute offenses under the Code must establish that it has satisfied section 16-102(c). [Citations.] The cases do not specify a burden of proof. We assume for the sake of this analysis that

the Village was required to prove only by a preponderance of the evidence that the prosecution of defendant complied with section 16-102(c). Although we recognize that location is a factual issue, we may decide whether the facts in evidence were legally sufficient for the Village to prevail. We hold that they were not. For the reasons given earlier, any conclusion that [the] defendant committed DUI within the Village was sheer speculation. When the Village decided to prosecute this case, it took on the burden to prove that [the] defendant committed his offenses within Village limits. The Village did not meet this obligation, and the judgment cannot stand." *Id.* ¶ 22.

¶ 65    In *Herman*, a Village of Frankfort police officer issued four traffic citations to the defendant, including two for DUI. *Herman*, 2012 IL App (3d) 110420, ¶¶ 1, 3. Each citation alleged that the defendant violated the Vehicle Code. *Id.* ¶ 3. Before trial, the Village's attorney filed a motion to amend the citations to designate the Village, rather than the State, as the prosecuting authority. *Id.* ¶ 4. However, the motion did not seek to modify the statutory basis for the violation. *Id.* The Village's attorney signed the motion. *Id.* The trial court granted the motion, and the citations were amended by crossing out " 'State of Illinois' " and replacing it with " 'Village of [Frankfort]' " as the plaintiff. *Id.* ¶ 5. An assistant state's attorney purportedly approved this change and indicated as much by writing her initials on the amended citation. *Id.* However, the citations were not changed to allege violations of village ordinances. *Id.* After a stipulated bench trial prosecuted by the Village's attorney, the defendant was found guilty of DUI under the Vehicle Code. *Id.* ¶ 6.

¶ 66    On appeal, the defendant argued that the Village did not have the authority to prosecute her for a Vehicle Code violation. *Id.* ¶ 8. The Third District agreed and reversed her conviction. *Id.* ¶¶ 12, 14. The court noted that the record on appeal did not contain written permission from

the state's attorney, granting the Village of Frankfort the authority to prosecute the DUI under the Vehicle Code. *Id.* ¶ 10. Moreover, the Village's attorney, rather than the state's attorney, presented the motion to amend the citations with no corresponding request to allege violations of the Village's ordinances. *Id.* The court stated:

> "Under these circumstances, we conclude the Village did not acquire the authority to prosecute [the] defendant for a designated violation of section 11-501(a)(1) of the *** Vehicle Code as set forth in the amended citation *** by simply having an assistant State's Attorney initial the face of the uniform citation." *Id.* ¶ 11.

¶ 67 Both *Zeinz* and *Herman* are distinguishable. *Zeinz* is readily distinguishable because the issue presented was not whether the Village had written permission to prosecute (it did), but instead whether the offense occurred within the Village's limits. At issue in *Herman* was the sufficiency of the claimed grant of permission to prosecute. In any event, neither case constitutes well-settled law establishing that reversal is warranted here because the Village failed to enter into the record evidence of its written permission to prosecute DUI (cannabis) in this case.

¶ 68 Given the plain language of the statute and our holding in *Wiatr*, we find that defendant has not established a clear or obvious error in the Village's failure to put forth evidence of its written permission to prosecute defendant under the Vehicle Code.

¶ 69 Even if we were to find that defendant established clear or obvious error, defendant would not be entitled to relief because he has not met his burden of establishing that the error is second-prong plain error. Citing *Moon*, defendant correctly notes that "[t]he next step [in a second-prong plain error analysis] is to determine whether the defendant has shown that the error was so serious it affected the fairness of the trial and challenged the integrity of the judicial process." (Internal quotation marks omitted.) To that end, defendant argues: "The error here was so serious that it

affected the fairness of [his] trial and challenged the integrity of the judicial [*sic*] because he was prosecuted by an entity that failed to show it had statutory authority to do so." However, defendant does not explain how the absence from the record of written permission to prosecute is comparable to any of the categories of structural error. See *Moon*, 2022 IL 125959, ¶¶ 26-30. He merely suggests that "[a] conviction which results from an unauthorized prosecution is an affront to the integrity of the judicial process." This conclusory argument is insufficient to carry his burden of persuasion. See *People v. Williams*, 2022 IL App (2d) 200455, ¶ 120 (merely suggesting that the alleged improper admission of evidence calls into question the verdict's reliability is insufficient to carry the burden of establishing second-prong plain error). In any event, we cannot say that the Village's failure to submit evidence that it had written permission to prosecute rises to the level of structural error. See *People v. Woodall*, 333 Ill. App. 3d 1146, 1159 (2002) ("Any defect in an attorney's appointment process or in his or her authority to represent the State's interests on a given matter is not fatal to the circuit court's power to render a judgment. The right to be prosecuted by someone with proper prosecutorial authority is a personal privilege that may be waived if not timely asserted in the circuit court."); see also *Village of Glen Ellyn v. Podkul*, 2024 IL App (3d) 220420-U, ¶ 20 (even assuming that the entry of judgment against the defendant without proof of the Village's prosecutorial authority was error, the defendant's argument "that the prosecution was brought by the wrong party" "did not rise to the level of a structural error that threatened the fairness or reliability of the trial").[5]

---

[5]Cited as persuasive authority under Illinois Supreme Court Rule 23(e)(1) (eff. Feb. 1, 2023) ("a nonprecedential order entered under subpart (b) of this rule on or after January 1, 2021, may be cited for persuasive purposes").

¶ 70    Accordingly, because defendant has not established clear or obvious error for purposes of plain error review, we hold him to his forfeiture.

¶ 71                                    B. Sufficiency of the Evidence

¶ 72    Defendant next contends that the evidence was insufficient to prove him guilty beyond a reasonable doubt of DUI (cannabis).

¶ 73    In considering a challenge to the sufficiency of the evidence, we ask only whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Hopkins*, 201 Ill. 2d 26, 40 (2002). Assessing the credibility of the witnesses and determining the weight to be given the evidence are matters within the prerogative of the fact finder. *People v. Holmes*, 141 Ill. 2d 204, 243 (1990). Moreover, we must allow all reasonable inferences from the evidence in favor of the State. *People v. Baskerville*, 2012 IL 111056, ¶ 31.

¶ 74    To obtain a conviction of DUI (cannabis) as charged, the State had to prove that defendant drove or was in actual physical control of the vehicle while he was under the influence of cannabis to a degree that rendered him incapable of safely driving. See 625 ILCS 5/11-501(a)(4) (West 2020).

¶ 75    Defendant contends that the evidence was insufficient to prove beyond a reasonable doubt that he was under the influence of cannabis to a degree that rendered him incapable of driving.[6] Defendant acknowledges his postdriving statements to Rogers admitting that he (1) had smoked marijuana the previous evening, (2) had stayed up until 3 a.m., and (3) was still feeling the effects

_____

    [6]Defendant does not dispute that he drove or was in actual physical control of the vehicle.

of the marijuana while talking to her. However, he argues that these statements are not dispositive. He claims that none of the witnesses were qualified to render an opinion on whether defendant was under the influence of cannabis. He further argues that, even if the evidence established that he was under the influence of cannabis, the evidence rebuts any finding that he was incapable of driving safely.

¶ 76    "Under the law of Illinois, proof of an offense requires proof of two distinct propositions or facts beyond a reasonable doubt: (1) that a crime occurred, *i.e.*, the *corpus delicti*; and (2) that the crime was committed by the person charged." *People v. Sargent*, 239 Ill. 2d 166, 183 (2010). A defendant's confessions, admissions, or extrajudicial statements alone cannot establish *corpus delicti*. *People v. Lara*, 2012 IL 112370, ¶ 17. "[T]he *corpus delicti* rule requires only that the corroborating evidence correspond with the circumstances recited in the confession and tend to connect the defendant with the crime." *Id.* ¶ 51. The independent corroborative evidence required is significantly less than the evidence needed to prove the defendant's guilt beyond a reasonable doubt. *Id.* ¶ 45. This evidence need not corroborate every element of the charged offense. *Id.* ¶ 50. "If such evidence tends to prove that the offense occurred and corroborates a defendant's confession, it may be considered, together with the confession, to establish the *corpus delicti* of the offense." *People v. Call*, 176 Ill. App. 3d 571, 575 (1988).

¶ 77    Here, the totality of the evidence was sufficient to prove defendant guilty beyond a reasonable doubt. First, as acknowledged by defendant on appeal, he admitted to Rogers that he smoked marijuana the night before and was still feeling its effects while talking to her. "[A] defendant's admissions can provide direct evidence of intoxication to sustain a conviction." See *People v. Ciborowski*, 2016 IL App (1st) 143352, ¶ 110; see also *People v. Workman*, 312 Ill. App. 3d 305, 311 (2000); *People v. Bitterman*, 142 Ill. App. 3d 1062, 1065 (1986). Indeed, Rogers

testified that defendant told her that "he had been up all night long because he had been using marijuana in the evening hours and had been caught by his mother and so he hadn't been sleeping well." He told Rogers that he "got high last night." When she asked him if he was still feeling the effects, he responded "that he must be."

¶ 78 Defendant's admission to being under the influence was corroborated by accounts of defendant's physical condition from individuals with varying degrees of experience dealing with people under the influence of cannabis. Rogers, who knew defendant "well," testified that defendant's "speech was slow" and his words were "slurry." He was "confused" and "couldn't respond quickly to questioning." He was "slow at walking"; "just slow, meandering, not moving at a typical pace that he had in previous experience."

¶ 79 Beale described defendant as "confused"; he "couldn't remember some of the questions that were being asked." Defendant "appeared very tired, lethargic," and his was speech was "slurred." Beale also testified as to defendant's performance on the FSTs, which were conducted about an hour after defendant finished driving. He noted that, during the Romberg balance test, defendant had "difficulty placing his feet in the correct position." He also had difficulty "keeping his eyes closed" and would "stop the test each time prior to 30 seconds." In addition, defendant was swaying "in a circular pattern," about three to four inches "in all directions." On the finger-to-nose test, defendant never touched the tip of his nose, hitting instead his cheek, eyeball, and nostril. Beale testified that he had to stop the test because he feared defendant might fall. Rogers observed the FSTs and agreed that defendant "just wasn't able to maintain his balance." Beale also testified that, as they walked to the squad car, defendant was not walking "normal[ly]" but instead in a "serpentine" fashion.

¶ 80    Weadick, who first encountered defendant at the police station, testified regarding defendant's performance on the FSTs that he conducted in the booking room, which were video recorded and viewed by the trial court. Asked by the trial court to describe defendant's performance, Weadick testified that during the Romberg balance test, defendant "stopped the 30-second test at 39 seconds" and exhibited a "pronounced sway" while performing the test. During the finger-to-nose test, defendant had a "very pronounced sway" and had "difficulty understanding the instructions." In addition, he "miss[ed] *** touching the tip of his finger to the tip of his nose." On the one-leg-stand test, defendant was "leaning to his left" and exhibited a "sway."

¶ 81    Defendant agrees that expert testimony is not required in every DUI drug case. See *People v. Gocmen*, 2018 IL 122388, ¶¶ 29, 62. Nevertheless, relying primarily on *Workman*, 312 Ill. App. 3d 305, and *People v. Vanzandt*, 287 Ill. App. 3d 836 (1997), defendant argues that the witnesses were not qualified to render an opinion that defendant was under the influence of cannabis. He cites both cases for the proposition that, "[w]hile a person's intoxication from alcohol can be established by a layperson's observations because such observations are within the competence of all adults of normal experience, the same cannot be said of drugs." He cites *Workman* for the proposition that, "[i]n order to offer an opinion that someone is under the influence of a drug or combination of drugs, a police officer must have the relevant skills, experience, or training to render such an opinion."

¶ 82    In *Workman*, the defendant was convicted of driving under the influence of a drug, *i.e.*, lorazepam, to a degree that rendered him incapable of safely driving. *Workman*, 312 Ill. App. 3d at 306, 311. We reversed based on the insufficiency of the evidence. We stated:

"[I]n a case involving a charge of driving under the influence of a drug or combination of drugs, when there is no competent evidence by a qualified witness regarding the nature and

effect of the drug alleged to have been ingested and the defendant has not admitted to taking the drug and being under the influence, this lack of competent testimony may create a reasonable doubt of the defendant's guilt, absent other sufficiently incriminating evidence." *Id.* at 311.

Thus, we held that the evidence was insufficient because (1) the defendant "denied taking the drug and never admitted to being under the influence of any chemical substance" and (2) the only evidence supporting the conviction was testimony from an officer who had no knowledge "about lorazepam, its nature, or its effects on a driver." *Id.* at 311-12.

¶ 83    In *Vanzandt*, the defendant was convicted of driving under the combined influence of alcohol and a drug, *i.e.*, insulin. *Vanzandt*, 287 Ill. App. 3d at 841. On appeal, the court noted that, regarding drug use, "the testimony of police officers that a defendant was under the influence of drugs would be sufficient, provided that the officers had relevant skills, experience, or training to render such an opinion." *Id.* at 845. The court reversed the defendant's conviction because (1) the defendant "never admitted 'being under the influence' of insulin" and (2) there was "no evidence that would indicate that insulin, either by itself or in combination with alcohol, would render a person incapable of driving safely." *Id.*

¶ 84    The present case is readily distinguishable from both *Workman* and *Vanzandt*. First, defendant admitted to Rogers that he had smoked marijuana the previous evening and was still feeling the effects as he was talking to her. Second, unlike the officers in *Vanzandt* and *Workman*, the officers here had training and experience in detecting the drugs at issue. Beale testified that he was trained in DUI detection while in the police academy and had additional training since then. To be sure, he testified that he had "a refresher, not really much training in regards to DUI detection with drugs." However, he also testified that he "had training in detecting individuals under the

influence of drugs besides alcohol." Further, in his 26 years as a police officer, he had encountered people under the influence of drugs "approximately over 100" times. Weadick testified that he had academy training in traffic enforcement and DUI detection, which included administering FSTs. Since that time, he had received additional training in detecting people under the influence of cannabis, including attending "Drug Recognition Expert, DRE, school." He had "completed numerous hours of continuing education in the fields of impaired driving enforcement and how drugs affect the body."

¶ 85    In addition, the trial court observed the defendant in two videos. In the video from the high school, defendant walked through several hallways on his way to and from the parking lot where the driver's education vehicle was located. As the court noted, the yellow line marking the center of the hallway made it clear that defendant was not walking in a straight line but was veering at various points to the left and right.

¶ 86    The trial court also reviewed the video-recorded FSTs conducted at the police station. To be sure, the court commented that defendant did "very well" on the FSTs at the police station, but the court also noted "one moment *** where the defendant los[t] his balance, reache[d] out with his left hand and scabs [*sic*] the sink to steady himself." The court also acknowledged that the tests at the police station occurred later, when the effects of the marijuana could have "dissipated somewhat," such that defendant performed "better than he did" when the FSTs were conducted at the school. We note, however, that, in addition to defendant's loss of balance noted by the trial court, defendant's performance on the video is consistent with Weadick's testimony that, during the modified Romberg balance test, defendant displayed a distorted estimation of time and that, on the finger-to-nose test, defendant missed touching the tip of his nose with the tip of his finger several times.

¶ 87    Considering all this evidence in the light most favorable to the prosecution, a reasonable factfinder could find beyond a reasonable doubt that defendant was under the influence of cannabis.

¶ 88    The evidence was also sufficient to prove beyond a reasonable doubt that defendant was under the influence of cannabis to a degree that rendered him incapable of driving safely. Although Peckler testified that he did not notice anything disconcerting about defendant while they walked to the vehicle, his concerns about defendant grew during the drive such that, by the end, he felt that "[t]here was something wrong here." Peckler noted that there were "several times" during the drive that he had to grab the steering wheel because defendant was "veering left and right." At one point, as defendant turned left into the inside lane, he veered into the outside lane, and Peckler "grabbed the wheel and put him back because there was a car approaching on [the] right." While driving through a roundabout, defendant "veer[ed] up towards the curb in the circle," and Peckler "had to grab the wheel" to redirect him. As they approached an intersection, Peckler had to use the brake on his side of the vehicle to stop the car because defendant "wasn't going to come to a complete stop." Peckler had to use his brake a second time when defendant approached a stoplight. This evidence, in addition to the evidence of defendant's physical condition upon his return to school, is sufficient to prove beyond a reasonable doubt that defendant was incapable of driving safely.

¶ 89    Considering all the testimony in the light most favorable to the State, the evidence was sufficient to prove defendant guilty beyond a reasonable doubt of DUI (cannabis).

¶ 90                                    III. CONCLUSION

¶ 91    Based on the foregoing, we affirm the judgment of the circuit court of Lake County.

¶ 92    Affirmed.

---

**Village of Lincolnshire v. Olvera**, 2024 IL App (2d) 230255

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, Nos. 21-DT-703, 21-TR-23260; the Hon. Bolling W. Haxall III, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Ann Fick, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Lawrence R. LaLuzerne, of LaLuzerne & Smith, Ltd., of Waukegan, for appellee. |