**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230220-U

Order filed August 22, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE VILLAGE OF LOMBARD, | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| Plaintiff-Appellee, | ) | Du Page County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-23-0220 |
| | ) | Circuit No. 21-DT-459 |
| | ) | |
| MICHAEL W. CASSELL, | ) | Honorable |
| | ) | Robert W. Rohm, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ALBRECHT delivered the judgment of the court.
Justices Hettel and Peterson concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  (1) Defendant forfeited his claim that the Village lacked express authority to prosecute. (2) The Village presented sufficient evidence that defendant was guilty of driving while under the influence of drugs. (3) Defendant's restitution is reduced to $500.

¶ 2    Defendant, Michael W. Cassell, appeals from his conviction for driving while under the influence of drugs (DUI drugs). Defendant contends that (1) the Village of Lombard (Village) erred by prosecuting him under the Illinois Vehicle Code (Code) (625 ILCS 5/11 *et seq.* (West 2020)) without a record of the written permission to prosecute from the state's attorney, (2) the

evidence was insufficient to prove him guilty beyond a reasonable doubt of DUI drugs, and (3) the Du Page County circuit court improperly imposed $600 in restitution. We affirm in part and vacate in part.

¶ 3                                    I. BACKGROUND

¶ 4        On March 9, 2021, defendant was arrested and charged with DUI drugs (*id.* § 11-501(a)(4)), among other offenses. A verification form was attached to the Village's complaint, which included the phrase "S.A. Approval," followed by a signature line. The signature line was left blank.

¶ 5        At a bench trial, Village Officer Michael Vazquez testified that he received the standard DUI detection and apprehension training at the police academy. The training included standardized field sobriety tests and the effects of alcohol and other drugs on a person's physical and mental abilities. In his five years as an officer, Vazquez received additional DUI training every few years and was involved in approximately 75 DUI investigations, several involving drug intoxications. Vazquez had over 30 encounters with offenders under the influence of drugs, observing individuals to have "[s]low responses, *** body tremors, dilated *** [and] constricted pupil sizes." Vazquez also completed supplemental Advanced Roadside Impairment Driving Enforcement (ARIDE), which trained officers to recognize drug impairment during standardized and nonstandardized field sobriety tests. The nonstandardized tests included reciting the alphabet, counting, modified Romberg, and lack of convergence. Standardized tests included horizontal gaze nystagmus (HGN), walk-and-turn, and one-leg stand. Vazquez did not recall the different drug categories or if he completed the training before or after defendant's arrest.

¶ 6        On March 9, 2021, at approximately 1 a.m., Vazquez observed a vehicle driving without headlights or taillights illuminated "swerve[ ] over" and "straddl[e]" the center line dividing the

2

two westbound lanes before moving back to its original lane. Vazquez did not observe any obstruction that would have caused the vehicle to move in that manner and initiated a stop. Vazquez's squad car was not equipped with a video recording system, and the driving portion of the stop was not captured. Body camera footage from Vazquez and an assisting officer captured the remaining encounter and were entered into evidence.

¶ 7        The following evidence was adduced from both Vazquez's testimony and the video recordings. When Vazquez approached the vehicle, defendant explained that he drove from Hoffman Estates to Wheaton. During the stop, defendant indicated that he had anxiety and was nervous but denied any other medical conditions. Vazquez informed defendant that he had been driving in the middle of two lanes without headlights. Defendant responded, "I'm sorry." Defendant stated he did not have his driver's license and provided Vazquez with the name Aaron J. Cassell. Defendant wore a face mask and a hat during most of the interaction. Vazquez observed that defendant's speech was "slurred, slow and low," which Vazquez believed could "be a sign of consumption" of "alcohol, drugs or anything of that sort." Defendant denied consuming alcohol or drugs, and Vazquez did not smell the odor of an alcoholic beverage emanating from defendant. Defendant offered to complete field sobriety tests or an "alcohol Breathalyzer" and denied consuming alcohol, drugs, or prescription medication.

¶ 8        Vazquez initiated seven field sobriety tests. First, Vazquez instructed defendant to complete the alphabet test by starting with the letter E, stating the alphabet to W. Defendant first recited the entire alphabet. Vazquez stopped defendant, and defendant continued to talk over Vazquez. Vazquez explained the test again, and defendant indicated he understood but then omitted the letter V. For the counting test, Vazquez told defendant to start with the number 67 and count down to 43. Defendant continued counting down past 43 to 38. Vazquez commented, "these

3

aren't mistakes your average person makes" and asked defendant what he consumed before driving. Again, defendant denied consuming anything. During the HGN test, Vazquez observed defendant "slightly swayed forward and back" and had to remind him twice to keep his head straight.

¶ 9     During the instructional phase of the walk-and-turn test, defendant stepped out of the starting position and asked for clarification on the instructions. After approximately six steps, defendant stated, "this is not good, can I just take a Breathalyzer?" When defendant reached 9 steps, Vazquez suggested that defendant complete the turn and defendant walked 15 more steps without counting his steps out loud. Vazquez asked defendant if he "remember[ed] the instructions" and "what happened to the turn?" Defendant turned around and took nine steps. Vazquez reminded defendant to count his steps out loud, and defendant asked if he "was on five?" Defendant then counted out loud starting with 1 and took 21 additional steps until Vazquez stopped him. Defendant's posture during the test was forward-leaning, hunched, stiff, and unsteady. Defendant also failed to walk heel to toe and raised his arms. Next, Vazquez conducted the one-leg stand test. Defendant counted to four and put his foot down. Defendant restarted the test and put his foot back down at five, stating, "this is a lot for me." Defendant lifted his foot again and continued counting to eight and put his foot back down. Defendant raised his foot and began counting from 1 to 11 until instructed to stop. Vazquez observed defendant sway, raise his arms more than six inches, and fail to look at his foot. On the modified Romberg test, Vazquez saw eye tremors, swaying, and commented that defendant was "not able to track time" accurately. Vazquez observed defendant's eyes showed a lack of convergence and his pupils had a "slow response" constricting to light.

4

¶ 10     The portable breath test (PBT) confirmed that defendant had not consumed alcohol. Vazquez asked defendant what he had consumed. Defendant responded that he took 120 milligrams of methadone that morning, later stating "maybe mid-afternoon" and denied consuming any other substances. Vazquez told defendant that he performed poorly on the standardized field sobriety tests, and defendant responded, "I understand that."

¶ 11     Following his transport to the police station, defendant informed Vazquez that he provided his twin brother's information during the stop and gave the officer his correct information. Defendant explained that he consumed "two milligram bars" of Xanax that morning in addition to the methadone. Initially, Vazquez could not explain what methadone was but later stated that when he learned defendant consumed methadone, Vazquez believed "[t]hat [defendant] was under the influence of a substance that could cause impairment." Defendant submitted to a blood draw from a phlebotomist and a urine sample. Vazquez contacted a Drug Recognition Expert (DRE) to perform further evaluations. Based on Vazquez's observations of defendant's driving, speech, performance on standardized and nonstandardized field sobriety tests, admission to consuming drugs, and his interactions with defendant, Vazquez opined that defendant was impaired and unfit to operate a motor vehicle safely and placed defendant under arrest for DUI drugs.

¶ 12     On cross-examination, Vazquez testified that defendant was cooperative, polite, dressed orderly, alert, and Vazquez could understand him. Vazquez failed to instruct defendant to "hold his head steady" during the lack of convergence test and improperly instructed defendant to "put his head back as far as possible" instead of "back slightly" on the modified Romberg test. Vazquez observed eye tremors during the modified Romberg test but no other body tremors. Defendant appropriately answered questions regarding where he was traveling from. Vazquez did not include in his report that defendant's pupils constricted to light.

5

¶ 13        Detective Steven Lay testified that he completed ARIDE training in 2017 and became a DRE in 2019. Lay conducted over 100 DUI investigations, 10% involving drug intoxication. Lay identified the different drug categories, including central nervous system depressants and narcotic analgesics. Lay explained that Xanax, a central nervous system depressant, "slows everything down," making a person "appear like they are under the influence of alcohol without the smell of alcohol." Additionally, a person may be drowsy, display a flushed face, exhibit HGN, and have an impaired "ability to perform divided attention tasks" such as standardized field sobriety tests. Lay explained that methadone, a narcotic analgesic, is a drug that substitutes for heroin, resulting in the same effects, including, "dosing [*sic*] in and out," droopy eyelids, slow breathing, and "constricted pupils." Lay stated that the "major indicators" for the presence of drugs included HGN, pupil size and reaction to light, pulse, blood pressure, and body temperature. Using more than one type of drug could cause opposite symptoms that cancel out each other. The court accepted Lay as an expert without objection from defendant.

¶ 14        On March 9, 2021, Lay arrived at the police station at approximately 2 a.m. to evaluate defendant and learned of the facts leading to defendant's arrest. Lay observed that defendant's eyelids were droopy and he appeared tired. Defendant was quiet, cooperative, and did not report any medical or health issues. Defendant exhibited slow, slurred, low-pitched speech. Defendant told Lay that he was addicted to and consumed Xanax daily, and drove to Hoffman Estates to buy it illegally. Defendant had taken "two bars around noon." Defendant also consumed a "one-pill dose" of methadone around 9 p.m. Lay took defendant's blood pressure and pulse and checked his pupils and resting nystagmus. Defendant's blood pressure systolic number was below the average range, and defendant's diastolic number was within the average range. Lay indicated that both depressants and narcotics bring down your blood pressure, consistent with defendant's admissions

6

to consuming both Xanax and methadone. Lay did not check defendant's body temperature. Lay first recorded defendant's pulse in the low range and the second time in a normal range. Lay observed that defendant's pupils were within a normal size range, which could have been a "cross-effect" of taking both methadone and Xanax.

¶ 15    Lay administered additional field sobriety tests. He conducted an HGN test and stated that his observations were consistent with defendant having consumed Xanax. Defendant did not exhibit a lack of convergence. On the modified Romberg test, Lay observed defendant sway, exhibit "eyelid tremors," and end the test at 37 seconds. Lay explained, "under 25 seconds or over 35 seconds can be indicative of impairment." During the walk-and-turn test, defendant was unable to maintain the starting position, took too few steps, stepped off the line, stopped, and "kind of shuffled both feet *** to turn around" like he was "unsure what to do." Lay administered the one-leg stand test on each leg according to his DRE training. Defendant lifted his right foot, raised his arms, and put his foot down once. Defendant then raised his left foot, and "swayed to the side, raised his arms, and kind of hopped on the foot and then had to put his raised foot down." Lay conducted the finger-to-nose test, and defendant could not touch the tip of his nose with his finger, failed to remove his finger immediately, and Lay had to instruct defendant to bring his finger back down. Defendant's performance on the field sobriety tests indicated that he was impaired. Lay visually observed defendant's muscle tone as "normal to flaccid *** consistent with [defendant's] admission to consuming methadone and Xanax." Lay did not physically examine defendant. Defendant stated he "did not feel impaired," and said his "tolerance to the drugs was high, so he didn't think that affected his ability" to drive. Based on his observations, Lay opined that defendant was under the influence of methadone and Xanax and "unable to operate a vehicle safely."

¶ 16    On cross-examination, Lay acknowledged that he failed to include defendant's muscle tone in his report and did not use proper DRE protocol when he failed to physically examine defendant's muscle tone, take defendant's pulse three times, and take defendant's body temperature. Defendant did not exhibit constricted pupils and his heart rate and pupil sizes were in the "range that you would expect for a normal, healthy, non-impaired person." Lay stated that taking defendant's temperature would have been important because methadone will reduce a person's temperature below normal. Lay agreed that he had "no reason to believe that [Xanax] should cancel out the effects of [methadone]." Defendant reported that he had been awake for 19 hours straight, which could cause a person to be tired and exhibit "droopy eyelids."

¶ 17    The court found defendant guilty of DUI drugs. Initially, the court addressed Lay's failure to follow proper procedure in administering the tests, describing Lay as "unbelievably irresponsible" and his actions as "unacceptable." The court reasoned that Lay's failures went to the weight of his testimony. The court found both Vazquez and Lay's testimony credible. The court specifically relied on the body camera videos, which showed defendant's "horrible" performance on the field sobriety tests. The court stated that defendant was "not a sober person." The court continued that defendant was

> "somebody who is not slightly impaired; [defendant] was wasted, no question. ***
> We know it was not alcohol. And does it matter to me what it is? *** If they're impaired and unable to drive safely, that's wrong. And I've been given no explanation ***. *** [O]ther than [defendant's] own admission ***. He was taking drugs and something caused that, what I saw in the video. ***
>
> So we have his own admission, so even if I disregarded *** Lay—and there's no reason to do that. I'm being critical of him, but that doesn't mean I don't

8

think he's a confident DRE. \*\*\* I just don't like intentionally taking shortcuts, but I do respect his opinion. \*\*\* [D]efendant's own admission coupled with \*\*\* Lay's opinions, in and of themselves that would not be enough, but you put that video out there and it's more than enough. There is no question in my mind. \*\*\* [Y]ou can't overcome that video. [Defendant] was clearly, not even slightly, intoxicated. \*\*\* He was \*\*\* hammered and he knows it and everybody that watched that video knows it."

The court concluded that, "despite the deficiencies" and "given the totality of the circumstances, specifically the video, the prosecution has proven" defendant guilty of DUI drugs.

¶ 18 The court denied defendant's amended motion for a new trial, commenting it had

"not seen many people more impaired than [defendant] on that video. \*\*\* I've seen [defendant] in front of me sober \*\*\*. That's not the guy in the video. \*\*\* His behavior, his mannerisms, the way he ambulates, the way he speaks, that's not the same guy. I saw a different person, and he was different because he was impaired by drugs that he admitted he was on."

The court continued that it did not "know what [defendant] was on," "what Methadone does," or "what [Xanax] does," but "whatever [defendant] was on, he was wasted." The court concluded that it had

"no doubt in [its] mind based on nothing more than that video that [defendant] was wasted. If the prosecution had to prove more than that, well, then I'm making a mistake, and I'm not going to try and justify my finding. I saw it with my own eyes.

I have an admission by the defendant that he took Methadone and \*\*\*

9

Xanax. I have a weak *** opinion from the officer that [defendant] was impaired. Absolutely there were holes."

The court opined that it "would have to be a moron to not recognize that [defendant] was severely, severely impaired by drugs." Defendant did not argue in his posttrial motions or at any time before that the Village lacked authority to prosecute him because it had not obtained the prior approval of the state's attorney.

¶ 19 During sentencing, the court attributed defendant's expressionless face to "extreme anxiety" and not "cognitive issues." Regarding restitution, the State requested $600 for phlebotomy and labs, to which the court agreed. The court sentenced defendant to court supervision. The $600 in restitution was reflected in defendant's sentencing orders. Defendant did not file a motion to reconsider his sentence. Defendant appealed.

¶ 20                                    II. ANALYSIS

¶ 21                        A. The Village's Authority to Prosecute

¶ 22 On appeal, defendant argues that his conviction must be vacated because the Village failed to show that it had obtained the prior approval of the state's attorney before prosecuting. At the outset, defendant concedes that he forfeited the issue by failing to raise it below. However, defendant initially contends that his conviction is void and can be raised at any time.

¶ 23 A municipality's failure to obtain authority to prosecute is not considered a jurisdictional defect. *People v. Wiatr*, 119 Ill. App. 3d 468, 472-73 (1983); *People v. Jennings*, 343 Ill. App. 3d 717, 726 (2003). Therefore, defendant's conviction was not void, and his challenge to prosecutorial authority is subject to forfeiture where it was not raised before the circuit court. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve an issue for appellate review, a defendant must object to it at trial and raise it in a posttrial motion); *Wiatr*, 119 Ill. App. 3d at 473 (defendant

10

forfeited the argument that the Village lacked written permission from the state's attorney giving the Village the authority to prosecute him by failing to raise the issue with the circuit court); *Jennings*, 343 Ill. App. 3d at 727 (defendant forfeited his claim on appeal to the appointment of a special prosecutor by failing to object at the circuit court).

¶ 24        Nonetheless, defendant attempts to avoid forfeiture by asking that we consider the issue under the second prong of the plain error doctrine, wherein defendant must demonstrate that a clear or obvious error occurred and "the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Moon*, 2022 IL 125959, ¶ 20. The first step in plain error is to determine whether an error occurred. *Id.* ¶ 22.

¶ 25        Recently, the Second District in *Village of Lincolnshire v. Olvera*, 2024 IL App (2d) 230255, ¶ 54, found that the lack of evidence in the record of the Village's authorization to prosecution was insufficient to establish that the Village improperly prosecuted defendant. In reaching this conclusion, the court determined that the plain language of section 16-102(c) of the Code stating, "the municipal attorney may prosecute *if written permission to do so is obtained from the State's Attorney*" ((emphasis added) 625 ILCS 5/16-102(c) (West 2020)), "does not impose an affirmative duty on a municipality to submit, at any time, proof of its authority to prosecute." *Olvera*, 2024 IL App (2d) 230255, ¶ 60. Therefore, the court reasoned, that the lack of proof of the Village's authority to prosecute could not amount to error under the plain error rule, and honored defendant's forfeiture. *Id.* ¶ 70. This conclusion is also supported by *Village of Glen Ellyn v. Podkul*, 2024 IL App (3d) 220420-U, ¶ 17, where this court found that defendant forfeited his argument that the Village lacked written permission from the state's attorney to prosecute.

¶ 26    Here, defendant's argument mirrors those raised in *Olvera* and *Podkul*, where he contends that the record's omission of the Village's approval and authority to prosecute requires his conviction to be vacated. As previously discussed, defendant concedes that he did not challenge the Village's lack of prosecutorial authority under section 16-102(c) of the Code during his proceedings or in a posttrial motion.[1] *Supra* ¶ 22. Accordingly, defendant forfeited any argument regarding this claim and did not establish an error permitting plain error review. See *Olvera*, 2024 IL App (2d) 230255, ¶ 70; see also *Podkul*, 2024 IL App (3d) 220420-U, ¶ 17.

¶ 27                                B. Sufficiency of the Evidence

¶ 28    Next, defendant argues the Village failed to prove him guilty beyond a reasonable doubt of DUI drugs. When a defendant makes a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact is responsible for assessing the credibility of the witnesses, weighing the testimony, and drawing reasonable inferences from the evidence. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). When presented with a challenge to the sufficiency of the evidence, we will not retry a defendant and must allow all reasonable inferences from the evidence in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42. "A conviction will be reversed only where the evidence is so unreasonable, improbable, or

_____

[1]Defendant relies upon several cases to support his claim that, without written permission from the state's attorney, his conviction is void and may be challenged at any time. See *City of O'Fallon v. Reynolds*, 2 Ill. App. 3d 712, 716 (1971); *Village of Hoffman Estates v. Spychalski*, 33 Ill. App. 3d 83, 85 (1975) (*per curiam*); *People v. Koetzle*, 40 Ill. App. 3d 577, 580 (1976); *People v. LaFrank*, 104 Ill. App. 3d 650, 652 (1982); *People v. Worthington*, 108 Ill. App. 3d 932, 935 (1982); *People v. Herman*, 2012 IL App (3d) 110420, ¶¶ 10-12. However, none of these cases consider a defendant who failed to challenge, at the circuit court level, the Village or City's authority to prosecute due to lack of written permission by the state's attorney, and thus, are inapplicable.

unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Belknap*, 2014 IL 117094, ¶ 67.

¶ 29    As charged in this case, section 11-501(a)(4) of the Code states: "A person shall not drive or be in actual physical control of any vehicle within this State while: *** under the influence of any other drug or combination of drugs to a degree that renders the person incapable of safely driving[.]" 625 ILCS 5/11-501(a)(4) (West 2020). "Intoxication is a question of fact, which is the trier of fact's responsibility to resolve ***." *People v. Hires*, 396 Ill. App. 3d 315, 318 (2009). "There is no 'generic' offense of 'driving under the influence.' " *People v. Workman*, 312 Ill. App. 3d 305, 310 (2000) (quoting *People v. Bitterman*, 142 Ill. App. 3d 1062, 1064 (1986)). Therefore, the Village must prove that the drug in question has "some intoxicating effect." *Id.* To render an opinion that defendant was under the influence of methadone and Xanax, a person must have "relevant skills, experience, or training." *Id.*

> "[W]hen there is no competent evidence by a qualified witness regarding the nature and effect of the drug alleged to have been ingested *and* the defendant has not admitted to taking the drug and being under the influence, this lack of competent testimony may create a reasonable doubt of the defendant's guilt, absent other sufficiently incriminating evidence." (Emphasis added.) *Id.* at 311.

However, "[t]he opinion of a qualified police officer that an individual was under the influence of a drug or drugs is by its nature circumstantial evidence, since it depends on that officer's drawing an inference of drug intoxication from the facts he observed personally." *Bitterman*, 142 Ill. App. 3d at 1065. Therefore, a conviction for driving while under the influence can be supported solely by the credible testimony of the arresting officer. *People v. Gordon*, 378 Ill. App. 3d 626, 632 (2007).

13

¶ 30    Here, Vazquez observed defendant driving poorly, straddling two westbound lanes without his lights illuminated. Defendant was unaware that his lights were off and exhibited low, muffled, and slurred speech. Defendant admitted to consuming methadone and Xanax prior to driving. The evidence established that a person under the influence of Xanax "is going to appear like they are under the influence of alcohol without the smell of alcohol," may appear "drowsy," and have an impaired "ability to perform divided attention tasks." Methadone has the same effects of heroin, including "dosing [*sic*] in and out or eyelids droopy, slow *** breathing down" and "constricted pupils." Vazquez testified to, and the corroborating video showed, defendant's inability to follow instructions. Defendant also exhibited poor performance on the field sobriety tests. Importantly, defendant's statements about his performance during the tests being "not good" and "a lot" for him, his request to take a "Breathalyzer" instead of completing the tests, and providing Vazquez with his twin brother's identifying information, contradict his later statement that he was not impaired by methadone and Xanax. At most, defendant's belief that he was not impaired shows a dissonance between the reality of his performance on the field sobriety tests and his understanding of the level of his intoxication. While defendant's opinion *may* create reasonable doubt in some instances, here it does not, given the remaining "sufficiently incriminating evidence." *Workman*, 312 Ill. App. 3d at 311. Defendant's performance was consistent with the effects of methadone and Xanax consumption and showed that defendant was intoxicated to such a degree as to render him incapable of driving safely.

¶ 31    What specific knowledge that Vazquez lacked regarding the effects of methadone and Xanax consumption was buttressed by Lay's testimony. See *People v. Gocmen*, 2018 IL 122388, ¶ 38 (a police officer is not required to be qualified as an expert to "opine as to whether a motorist was under the influence of drugs"); see also *People v. Sutherland*, 223 Ill. 2d 187, 243 (2006) (the

14

trier of fact need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances but rather be satisfied that all evidence, taken together, establishes defendant's guilt). Despite the court's disregard of Lay's observations following his improper examination procedure, it accepted Lay as an expert without objection, and found him credible. See *People v. Spaulding*, 68 Ill. App. 3d 663, 675 (1979) ("the trier of fact is free to believe part of one's testimony without believing all of it"). Moreover, the court relied on other corroborating evidence including its observations of defendant in court in contrast with defendant's appearance on the video. See *People v. Deleon*, 227 Ill. 2d 322, 332 (2008) ("[W]e give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and witnesses."). The reasonable inference which flows from these facts is that defendant's consumption of methadone and Xanax rendered him incapable of driving safely. See *People v. Morris*, 2014 IL App (1st) 130152, ¶ 20 ("Circumstantial evidence alone may suffice to prove a defendant guilty of DUI. [Citation.] Where the arresting officer provides credible testimony, scientific proof of intoxication is unnecessary."); see, *e.g.*, *cf. People v. Vanzandt*, 287 Ill. App. 3d 836, 845 (1997) (insufficient evidence to support DUI drugs where defendant refused standardized field sobriety test and a PBT admitted to consuming but not being under the influence of insulin, and defendant's diabetes could have caused the appearance of intoxication); *cf. Workman*, 312 Ill. App. 3d at 311 (insufficient evidence of DUI drugs where defendant denied consuming drugs, and there was no evidence of poor driving, what drugs defendant was intoxicated by, or the intoxicating effects of any specific drug); *cf. People v. Trotter*, 2021 IL App (3d) 180726-U, ¶ 39 (insufficient evidence of DUI drugs where the State failed to link defendant's poor driving and performance on standardized field sobriety tests to the consumption of Adderall); *cf. People v. Monday*, 2023 IL App (3d) 220025-U, ¶ 14 (insufficient evidence of DUI drugs where defendant denied consuming

15

drugs and there was no scientific evidence of intoxication or expert testimony regarding drug detection despite defendant's signs of impairment on the HGN, walk-and-turn test, and the odor of cannabis). Therefore, the Village presented sufficient evidence to support defendant's conviction for DUI drugs beyond a reasonable doubt.

¶ 32                                              C. Restitution

¶ 33         Finally, defendant contends that the court improperly imposed $600 restitution for phlebotomy and labs to the Village Police Department. Defendant concedes that he forfeited this issue and asks that we review it under the second prong of the plain error doctrine. See *Enoch*, 122 Ill. 2d at 186; see also *People v. Birge*, 2021 IL 125644, ¶¶ 51-53 (lack of sufficient evidence for a restitution order can amount to second prong plain error). As stated above, the first step of the plain error doctrine is to determine whether error occurred. *Supra* ¶ 24.

¶ 34         The circuit court is authorized by section 5-5-6 of the Unified Code of Corrections (Unified Code) to order restitution when a person has "received any injury to his *** person or damage to his *** real or personal property as a result of the criminal act of the defendant ***. *** [T]he court must *** determine whether restitution is an appropriate sentence to be imposed on each defendant convicted of an offense." 730 ILCS 5/5-5-6 (West 2020). The Unified Code further provides: "[T]he court shall assess the actual out-of-pocket expenses, losses, damages, and injuries suffered by the victim." *Id.* § 5-5-6(b). A "victim" under the restitution statute is someone who has suffered, among other things, financial loss. *People v. Danenberger*, 364 Ill. App. 3d 936, 943 (2006). When the question presented is whether a circuit court's restitution determination is authorized by law, we employ *de novo* review. *People v. Cameron*, 2012 IL App (3d) 110020, ¶ 35.

¶ 35 Generally, " 'a police department or government agency is not considered a "victim" within the meaning of the restitution statute [citation].' " *People v. Ford*, 2016 IL App (3d) 130650, ¶ 27 (quoting *People v. Derengoski*, 247 Ill. App. 3d 751, 754 (1993)). "The 'rationale *** is that a law enforcement agency ought not be compensated for the public money that it spends in performing its basic function of investigating and solving crimes.' " *Id.* ¶ 28 (quoting *Danenberger*, 364 Ill. App. 3d at 944). However, "there is no *per se* rule prohibiting a law enforcement agency from receiving restitution." *Id.* ¶ 29. In instances of DUI investigations that result in a conviction, "[a] person that is subject to a chemical test to tests of blood ***, shall be liable for the expense up to $500 for blood withdrawal by a *** trained phlebotomist ***." 625 ILCS 5/11-501.01(j)(1), (2) (West 2020).

¶ 36 In the present case, the record shows that defendant submitted to a blood draw performed by a phlebotomist. As a result, the statute allowed the court to order defendant to pay $500 to the Village Police Department to cover expenses related to his blood draw. See *id.* Section 11-501.01 does not provide reimbursement for fees related to laboratory testing of blood or urine samples. The restitution "for lab" fees, exceeding the $500 permitted by section 11-501.01(j) lacks any evidentiary support. See *id.* Therefore, we find that the $100 in restitution that exceeds the statutory $500 amounts to second prong plain error. See *Birge*, 2021 IL 125644, ¶¶ 51-53. We vacate $100 in restitution and affirm the remaining $500. See Ill. S. Ct. R. 366(a)(5) (eff. Feb. 1, 1994).

¶ 37                                          III. CONCLUSION

¶ 38 The judgment of the circuit court of Du Page County is affirmed in part and vacated in part.

¶ 39 Affirmed in part and vacated in part.