**2025 IL 130775**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

(Docket No. 130775)

THE VILLAGE OF LINCOLNSHIRE, Appellee, v.
DANIEL OLVERA, Appellant.

*Opinion filed May 22, 2025.*

JUSTICE ROCHFORD delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville, Overstreet, Holder White, Cunningham, and O'Brien concurred in the judgment and opinion.

## OPINION

¶ 1    Following a bench trial in the circuit court of Lake County, the defendant, Daniel Olvera, was convicted of driving under the influence (DUI) of drugs (625 ILCS 5/11-501(a)(4) (West 2020)), specifically cannabis. [1] On appeal to the

---

[1]Defendant also was convicted of improper lane usage under the Illinois Vehicle Code (625 ILCS 5/11-709(a) (West 2020)), as well as possession of cannabis and reckless

Appellate Court, Second District, defendant argued that his conviction must be reversed because the Village of Lincolnshire (Village) improperly prosecuted him for a violation of the Illinois Vehicle Code (Code) (625 ILCS 5/1-100 *et seq.* (West 2020)). 2024 IL App (2d) 230255. Defendant also argued that the evidence was insufficient to prove him guilty beyond a reasonable doubt of DUI. The appellate court affirmed defendant's conviction. For the following reasons, we affirm the judgment of the appellate court.

¶ 2                                          BACKGROUND

¶ 3         On May 6, 2021, defendant was a 16-year-old sophomore at Stevenson High School in Lincolnshire, Illinois. Defendant's seventh-period class that day was driver's education. Defendant went for a practice drive with driving instructor Scott Peckler and a female student, who rode in the back of the vehicle. Details of the practice drive and the events leading up to defendant's arrest and prosecution are set forth more fully below in addressing defendant's claim that he was not proven guilty beyond a reasonable doubt. In brief, at the conclusion of the driving lesson, Peckler spoke with Courtney Bresnan, the director of the driver's education program, telling her "there's something going on here, I think you should check this out," referring to defendant.

¶ 4         Defendant's assigned dean, Sara Rogers, then responded to a report that a student was suspected of driving under the influence. Rogers interviewed defendant, who told Rogers that his mother had caught him smoking marijuana the night before and he could not sleep because he was worried about his mother's reaction. During a student safety search, Rogers and another dean found a skinny, white, rolled cigarette in the folds of defendant's wallet. Defendant told Rogers it was a marijuana cigarette. Rogers then called the school resource officer, T.J. Beale. Rogers gave Beale defendant's wallet and the cigarette and told Beale that she suspected defendant was under the influence and was in possession of marijuana. Beale then conducted two field sobriety tests and arrested defendant for driving under the influence of drugs.

conduct under Village of Lincolnshire ordinances, but he did not challenge those convictions in the appellate court or in this court.

¶ 5        Beale took defendant to the Lincolnshire Police Department, where they met Officer Barrett Weadick. Weadick conducted six field sobriety tests at the station and testified at trial that the tests "absolutely indicated impairment." Beale arrested defendant and charged him under the Code with driving under the influence of drugs and improper lane usage. Defendant also was charged with possession of cannabis and reckless conduct under Village ordinances.

¶ 6        The charges were prosecuted by the prosecutor for the Village. The case proceeded to a bench trial. The trial court found defendant guilty of all charges and placed defendant on 12 months' supervision for the DUI charge. Defendant did not file a motion for a new trial or a motion to reconsider sentence.

¶ 7        Defendant then appealed. Defendant raised two issues on appeal. Defendant first argued that it was improper for the Village to prosecute him because the Village did not provide proof in the trial record of its written permission from the State to prosecute the case. Defendant claimed that the Village was required to do so under section 16-102(c) of the Code (625 ILCS 5/16-102(c) (West 2020)). Defendant conceded that he had forfeited the issue by not raising it below but argued that the error was plain error, reviewable under the second prong of plain error review.

¶ 8        In addressing defendant's appeal, the appellate court first noted that the Village had included in the appendix to its brief a copy of a letter from the Lake County State's Attorney, dated December 1, 2020, granting the Village the authority to prosecute Code violations occurring within its boundaries. The appellate court declined to consider the letter on the basis that the letter was not included in the record in the case. 2024 IL App (2d) 230255, ¶ 56. The appellate court then stated that there was no question that the Village must have written permission from the state's attorney to prosecute violations of the Code, pursuant to section 16-102(c) of the Code, but it found that the plain language of section 16-102(c) did not further impose an affirmative duty on a municipality to submit proof of its authority to prosecute at trial. *Id.* ¶ 60. For that reason, defendant failed to establish that the Village's failure to enter evidence of its written permission to prosecute into the record constituted clear or obvious error. *Id.* ¶ 68.

¶ 9        In addition, the appellate court stated that, even if it found that defendant had established clear or obvious error, defendant would not be entitled to relief because

he could not establish that the error was second prong plain error. *Id.* ¶ 69. The court stated that the Village's failure to submit evidence that it had written permission to prosecute did not rise to the level of structural error. *Id.* Accordingly, the appellate court found that defendant had forfeited his claim that it was improper for the Village to prosecute him absent evidence in the record establishing the Village's written authorization to prosecute him. *Id.* ¶ 70.

¶ 10 The appellate court then reviewed the evidence in the case and found that, construing the evidence in the light most favorable to the prosecution, a reasonable factfinder could find beyond a reasonable doubt that defendant was under the influence of cannabis. *Id.* ¶ 87. The appellate court further found that the evidence was sufficient to prove beyond a reasonable doubt that defendant was under the influence of cannabis to a degree that rendered him incapable of driving. *Id.* ¶ 88. The appellate court therefore affirmed defendant's conviction.

¶ 11 Defendant then filed a petition for leave to appeal to this court, which this court granted. Ill. S. Ct. R. 315(a) (eff. Dec. 7, 2023).

¶ 12                                    ANALYSIS

¶ 13 In this court, defendant again argues that the Village was required to establish, in the record, that it had written permission from the state's attorney to prosecute a violation of the Code and that the failure to include that evidence in the record constituted second prong plain error. Defendant also argues that the evidence in this case was not sufficient to prove beyond a reasonable doubt that he was under the influence to such a degree as to render him incapable of driving safely.

¶ 14 We first address defendant's claim concerning the Village's written permission to prosecute. As noted, defendant concedes that he forfeited this issue because he did not raise it in the trial court. Defendant maintains, however, that the Village's failure to provide evidence of its written permission to prosecute constitutes plain error under the second prong of the plain error doctrine.

¶ 15 The plain error rule is an exception to forfeiture that allows a reviewing court to excuse a defendant's procedural default. *People v. Moon*, 2022 IL 125959, ¶ 19. The rule is set forth in Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) and

- 4 -

states that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." A forfeited claim will constitute plain error in two circumstances:

"(1) where a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error and (2) where a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Belknap*, 2014 IL 117094, ¶ 48.

¶ 16 The first step in plain error review, then, is determining whether a clear or obvious error occurred. *People v. Johnson*, 2024 IL 130191, ¶ 44. In this case, that determination begins with a review of the statute at issue. The construction of a statute is a question of law that is reviewed *de novo*. *People v. Stewart*, 2022 IL 126116, ¶ 13.

¶ 17 The statute provides:

"The State's Attorney of the county in which the violation occurs shall prosecute all violations except when the violation occurs within the corporate limits of a municipality, the municipal attorney may prosecute if written permission to do so is obtained from the State's Attorney." 625 ILCS 5/16-102(c) (West 2020).

¶ 18 Defendant does not dispute that the Village had written permission to prosecute violations of the Code in this case but argues that "written permission" necessarily includes the requirement that a municipality introduce its written permission into the record. The Village responds that section 16-102(c) does not impose an affirmative duty on a municipality to submit proof of its authority to prosecute into the trial record.

¶ 19 It is well established that the primary objective of this court in construing a statute is to ascertain and give effect to the intent of the legislature. *People v. Burge*, 2021 IL 125642, ¶ 20. The best indication of the legislature's intent is the statutory language, given its plain and ordinary meaning. *Id.* Where the statutory language is

clear and unambiguous, it should be applied without resort to additional aids of statutory construction. *Stewart*, 2022 IL 126116, ¶ 13.

¶ 20    Both parties agree that section 16-102(c) is clear and unambiguous and should be given its plain and ordinary meaning. The parties disagree, however, concerning the plain and ordinary meaning of the statute. As noted, defendant argues that the plain and ordinary meaning of section 16-102(c) is that a municipality must have written permission to prosecute a violation of the Code *and* must provide evidence of its written permission in the record. The State responds that the statute does not impose an affirmative duty on a municipality to do so. We agree with the State.

¶ 21    Section 16-102(c) is clear and unambiguous in stating that "the municipal attorney may prosecute [violations of the Code that occur within the corporate limits of the municipality] if written permission to do so is obtained from the State's Attorney." See 625 ILCS 5/16-102(c) (West 2020). The statute makes no reference to introducing that written permission into the record of the prosecution. Although defendant argues that the language of the statute should be given its plain and ordinary meaning, defendant would have this court add additional language to the statute to that effect. No rule of construction authorizes this court to declare that the legislature did not mean what the plain language of the statute imports, nor may this court rewrite a statute to add provisions or limitations that the legislature did not include. *Illinois State Treasurer v. Illinois Workers' Compensation Comm'n*, 2015 IL 117418, ¶ 28.

¶ 22    Defendant also cites *Village of Bull Valley v. Zeinz*, 2014 IL App (2d) 140053, and *People v. Herman*, 2012 IL App (3d) 110420, in support of his claim that section 16-201(c) requires a municipality to establish in the record that it has written permission to prosecute. Those cases, however, are distinguishable.

¶ 23    In *Zeinz*, the defendant argued that his convictions could not stand because the Village of Bull Valley failed to establish that he committed either one of his charged Code violations within its corporate limits. *Zeinz*, 2014 IL App (2d) 140053, ¶ 1. The appellate court agreed with the defendant, noting that any conclusion that the defendant committed a DUI within the village was "sheer speculation." *Id.* ¶ 22. The court stated that "[w]hen the Village decided to prosecute this case, it took on the burden to prove that defendant committed his offenses within Village limits."

*Id.* Because the Village did not meet that burden, the defendant's conviction could not stand. *Id.*

¶ 24       Defendant argues that, although *Zeinz* focused on the statute's first requirement, the holding applies equally to the second requirement. In other words, if a municipality must establish that the offense occurred within its corporate limits, it follows that the municipality must also establish that it received written permission to prosecute.

¶ 25       The appellate court found the *Zeinz* decision distinguishable on the basis that the issue in *Zeinz* was whether the offense occurred within Bull Valley's village limits, not whether Bull Valley had written permission to prosecute. 2024 IL App (2d) 230255. ¶ 67. We agree. In this case, defendant does not argue that the charged offenses did not take place in Lincolnshire.

¶ 26       Moreover, the *Zeinz* court did not address whether section 16-102(c) imposed an affirmative duty on a municipality to submit proof that the charged violation occurred within the corporate limits of the municipality, as the issue arose when the defendant moved for a directed verdict at the close of Bull Valley's case. *Zeinz*, 2014 IL App (2d) 140053, ¶ 7. At that point, the defendant argued that Bull Valley had not produced evidence that the charged offenses were committed within its corporate limits. *Id.* It was in that context, then, that the *Zeinz* court determined that a municipality relying on a grant of authority to prosecute offenses under the Code must establish that it has satisfied section 16-102(c). *Id.* ¶ 22.

¶ 27       Accordingly, we find the *Zeinz* decision is inapposite. The *Zeinz* decision does not support defendant's claim that section 16-102(c) imposes an affirmative duty on a municipality to submit proof of its written permission to prosecute into the trial court record.

¶ 28       In *Herman*, the defendant was issued traffic citations under the Code that named the People of the State of Illinois as prosecutor. *Herman*, 2012 IL App (3d) 110420, ¶ 1. The municipal attorney for the Village of Frankfort later filed a motion to amend the citations to designate Frankfort as the prosecuting authority. *Id.* ¶ 4. The original traffic citations were amended on their face by crossing out " 'State of Illinois' " and writing " 'Village of [Frankfort]' " as plaintiff. *Id.* ¶ 5. An assistant state's attorney purportedly initialed the face of the amended citations near the

handwritten changes. *Id.* On appeal, the defendant argued that Frankfort was without the authority to prosecute defendant for a violation of the Code. *Id.* ¶ 8.

¶ 29 The appellate court agreed with the defendant, concluding that under the circumstances, Frankfort did not acquire the authority to prosecute the defendant for a violation of the Code simply by having an assistant state's attorney initial the face of the uniform citation. *Id.* ¶ 11. The appellate court stated that the "record on appeal does not contain written permission from the State's Attorney granting the Village attorney the necessary written authority to prosecute the citations" based on the Code. *Id.* ¶ 10. In support, the *Herman* court cited *People v. Koetzle*, 40 Ill. App. 3d 577 (1976), which held that a municipality had no authority to prosecute violations of the Code where there is no written permission to prosecute. *Herman*, 2012 IL App (3d) 110420, ¶ 10.

¶ 30 Defendant in this case argues that *Herman* supports his interpretation of section 16-201(c) because the state's attorney and the municipal attorney in that case at least made some effort to demonstrate that the defendant was being prosecuted by the proper authority. Defendant reasons that, if an insufficient effort to demonstrate authority can be the basis for reversal, then no effort at all must also be a basis for reversal.

¶ 31 Defendant misinterprets the holding of *Herman*. *Herman* did not reverse the defendant's conviction based upon an insufficient effort to demonstrate authority. *Herman* reversed the defendant's conviction on the basis that an assistant state's attorney's handwritten initials on the face of a traffic citation that crossed out "State of Illinois" and wrote in "Village of Frankfort" did not constitute written permission to prosecute for purposes of the statute. *Herman* thus is not on point, as there is no question in this case that the Village did have written permission to prosecute Code violations occurring within Lincolnshire.

¶ 32 In sum, the plain language of section 16-201(c) requires a municipality to have written permission from the state's attorney of the county in which the violation occurs in order to prosecute violations of the Code occurring within the corporate limits of the municipality. The parties agree that the Village did have such written permission in this case. The statute does not require the Village to submit its written permission into the record. Consequently, the fact that the written permission was absent from the record did not, as defendant argues, mean that the Village lacked

the authority to prosecute defendant for DUI under the Code. Accordingly, the failure to introduce the Village's written permission to prosecute into the record did not constitute error, let alone plain error. The appellate court therefore properly determined that defendant failed to establish clear or obvious error in this case that would overcome defendant's forfeiture of the issue.

¶ 33    Defendant next argues that the evidence was insufficient to prove him guilty beyond a reasonable doubt. The relevant portion of the Code states:

> "(a) A person shall not drive or be in actual physical control of any vehicle within this State while:

> * * *

>     (4) under the influence of any other drug or combination of drugs to a degree that renders the person incapable of safely driving[.]" 625 ILCS 5/11-501(a)(4).

In the appellate court, defendant argued both that the evidence was insufficient to prove beyond a reasonable doubt (1) that he was under the influence of cannabis and (2) that he was under the influence of cannabis to a degree that rendered him incapable of safely driving. In this court, defendant argues that, assuming *arguendo* that defendant was under the influence of cannabis, the evidence was insufficient to prove beyond a reasonable doubt that he was under the influence to a degree that rendered him incapable of driving safely.

¶ 34    In reviewing a challenge to the sufficiency of the evidence, this court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the required elements of the crime beyond a reasonable doubt. *People v. Galarza*, 2023 IL 127678, ¶ 25. When faced with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant. *People v. Jones*, 2023 IL 127810, ¶ 28. It is the trier of fact's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the facts. *Galarza*, 2023 IL 127678, ¶ 25. A reviewing court will not substitute its judgment for that of the trier of fact on questions involving the credibility of witnesses or the weight of the evidence. *Jones*, 2023 IL 127810, ¶ 28. A trier of fact is not required to disregard inferences

that flow normally from the evidence and is not required to search out all possible explanations consistent with innocence and raise those inferences to a level of reasonable doubt. *Galarza*, 2023 IL 127678, ¶ 25. Rather, all reasonable inferences from the evidence must be drawn in favor of the State. *Jones*, 2023 IL 127810, ¶ 28. A criminal conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *Galarza*, 2023 IL 127678, ¶ 26.

¶ 35 The relevant evidence at defendant's trial was as follows. Peckler testified that he did not notice anything unusual about defendant during the walk to the vehicle to begin the driving lesson. Defendant drove for around 40 minutes. Peckler testified that defendant had difficulty maneuvering the car when backing out of the parking space, requiring Peckler to help him a "little bit." Defendant did not look over his shoulder or check the car's rearview mirror when backing out. While driving, Peckler directed defendant to turn left onto a street with two lanes in each direction. Defendant veered into the outside lane as he turned left into the inside lane, causing Peckler to grab the wheel to avoid a car approaching on the right. Defendant was veering left and right as he drove down the road. Peckler grabbed the wheel several times to put defendant back into the proper lane. Peckler thought defendant likely was a little nervous while driving.

¶ 36 Peckler then directed defendant to a roundabout and explained how to travel through it. Defendant kept talking to the other student in the vehicle, so Peckler told defendant to concentrate on driving. When defendant entered the roundabout, he veered up toward the curb in the circle, causing Peckler to grab the wheel to redirect him. Peckler directed defendant through the roundabout a second time and again had to grab the wheel.

¶ 37 Peckler testified that, after exiting the roundabout and driving for a short distance, defendant approached a stop sign. Peckler had to use the brake on his side of the car to stop the vehicle because defendant "wasn't going to come to a complete stop." Peckler again had to use his brake when defendant approached a stoplight. Peckler testified that, at this point, he believed defendant was very nervous while driving. Peckler stated that he had "seen students drive all over the place because they're afraid. They don't practice at home. That's a big factor."

¶ 38    Defendant then headed back toward the roundabout. Peckler testified that defendant still had difficulty, weaving left and right, although Peckler did not have to grab the steering wheel. Defendant next approached a red light, and as the light turned green, Peckler saw defendant's head go down. Peckler asked defendant if he was okay. Defendant said that he was tired and that he hadn't slept. Defendant then made a right turn a "little erratically."

¶ 39    Peckler testified that, as defendant drove back to school, he kept talking to the student passenger. Peckler said that he tried to keep defendant "directed toward the task at the time." Defendant was weaving while driving, so Peckler had to grab the steering wheel several times. Peckler testified that it "could have been nerves."

¶ 40    Upon returning to school, defendant had a little bit of difficulty parking the vehicle. Peckler said that he had to help defendant straighten out the car and put it into the parking space. Following the driving lesson, Peckler spoke with Bresnan, the director of driver's education, and told her, "[T]here's something going on here, I think you should check this out."

¶ 41    On cross-examination, Peckler said that he was familiar with the odor of cannabis and did not detect the odor of cannabis or any other unusual odor emanating from defendant. Peckler said that he would not allow a student to drive if he believed that the student was "high." Defense counsel asked, "if you think a kid might be high, you're not going to put him in a car?" Peckler responded "of course not." Peckler also said "there was some behavior that was indicated that— you know, a little foolish whatever, but nothing that I would say I'm going to keep him out of the car." Peckler also testified that, when defendant was talking to the student passenger in the vehicle, Peckler noticed a "little slur" but said it could be fatigue.

¶ 42    On redirect examination, Peckler testified that his concerns about defendant increased toward the end of the drive. At that point, Peckler believed there was something wrong but could not pinpoint it.

¶ 43    Sara Rogers next testified that she had been the dean of students at Stevenson High School for the past eight years. Rogers knew defendant well because she had been assigned as his dean since defendant's freshman year. Rogers testified that on May 6, 2021, she was asked to report to the driver's education room because a

student was suspected of driving under the influence. Rogers spoke with defendant and testified that his speech was slow, he was confused, and he could not respond quickly to questioning. Rogers was concerned and walked him to the nurse's office because Rogers thought he needed to be checked out medically. Rogers explained that defendant was walking slowly, responding slowly, speaking slowly, and slurring his words. Rogers said she had spoken with defendant more than 30 or 40 times before May 6, had seen him every day, and had interacted with him quite a bit. Defendant was not moving at his typical pace as they walked to the nurse's office. After defendant saw the nurse, the nurse told Rogers that defendant was "really nervous, really upset, worried, and slow in his speech."

¶ 44       Rogers testified that she interviewed defendant, who told her that he had been up all night because he had been using marijuana in the evening and that his mother caught him.

¶ 45       Given defendant's admission about using marijuana, Rogers called David Schoenfisch, another dean of students at the high school, and asked Schoenfisch to conduct a student search of defendant. Schoenfisch searched defendant and found a skinny, white, rolled object in defendant's wallet. Defendant told Rogers that it was a marijuana cigarette. Rogers said she concluded from the appearance and scent of the object that it was a marijuana cigarette. Rogers then called Officer Thomas Beale, a Village police officer who was employed by the high school as a school resource officer. Rogers told Beale that she suspected that defendant was under the influence of marijuana and was in possession of marijuana.

¶ 46       Rogers testified that Beale left to write tickets. Beale returned less than 15 minutes later and said that he wanted to conduct field sobriety tests on defendant. Beale conducted a balance assessment on defendant. Rogers observed the test and said that defendant was not able to maintain his balance. Defendant kept falling over, losing his balance and catching himself with his other foot or his hand. Beale stopped the test and informed defendant that he would be arrested.

¶ 47       On cross-examination, Rogers testified that defendant said he had gone to bed around 3 a.m. Although defendant said his mom had caught him smoking pot that evening, defendant did not say what time his mom had caught him.

¶ 48    The trial court then questioned Rogers, inquiring whether she had asked defendant what time he had last used marijuana. Rogers replied that she had not. The trial court asked Rogers if she had asked defendant if he was still feeling the effects of the marijuana at the time he met with her. Rogers said she did ask defendant if he was still feeling the effects and he said that "he must be." When the trial court asked Rogers to clarify, Rogers reiterated that defendant said he still was feeling the effects of the marijuana at the time defendant spoke with her. Rogers told the trial court that she believed defendant was under the influence of cannabis at the time she spoke with him. When the trial court asked Rogers if defendant's behavior could be due to staying up all night, Rogers said she thought defendant's behavior was because he was under the influence. The trial court again asked Rogers if defendant's emotional response could be due to the fact that his mother had caught him smoking marijuana. Rogers replied "no" and again stated that she believed he was still under the influence.

¶ 49    Schoenfisch testified that Rogers called him to assist with a student. Schoenfisch asked to search defendant and uncovered a marijuana "joint" in defendant's wallet during the search. When Schoenfisch asked defendant what the item was, defendant responded that it was marijuana. On cross-examination, Schoenfisch testified that he did not notice any balance issues when defendant stood up to be searched.

¶ 50    Beale testified that he had been a police officer for 26 years and had been the school resource officer at Stevenson High School since August 2020. Beale testified concerning his training in DUI detection. With regard to defendant, Beale testified that he responded to Rogers's request to meet her at the nurse's office. Rogers told Beale that there had been a report that defendant was not "acting right" during driver's education and that they believed he could possibly be under the influence of drugs. Beale also was told that a cannabis cigarette had been found in defendant's wallet. Beale testified that the cigarette smelled like cannabis and that defendant admitted the cannabis was his and that he had been smoking the night before. Beale observed that defendant's speech was slurred and he appeared to be confused. Defendant was not answering questions and could not remember some of the questions that he was asked. Defendant also appeared very tired and lethargic.

¶ 51     Beale testified that he was informed that defendant had been driving for driver's education and was told that defendant's poor driving led the instructor to believe that defendant was under the influence of drugs. After speaking with Bresnan, Beale conducted a field sobriety test on defendant. Beale first had defendant perform the "Romberg balance test," which was where an individual stands with his feet together and his arms down at his sides. The individual then raises his chin, so it is pointing up. The individual then closes his eyes and counts or tells the officer when 30 seconds is up. Beale said that, when defendant performed the test, he first had difficulty placing his feet in the correct position and aligning them so he could keep his balance. Defendant did lose his balance and had to grab a chair to prevent himself from falling one of the times he was attempting to do the test. Once defendant's feet were properly aligned and he was in the correct position, defendant attempted to do the test three times. Beale testified that, during all three tests, defendant would "sway in all directions" and would have a hard time keeping his eyes closed. Defendant also would lower his chin. Defendant stopped each test before 30 seconds had elapsed. Beale described defendant's balance as "poor."

¶ 52     Beale next asked defendant to perform a "finger-to-nose" test, instructing defendant to raise both arms to the side at about shoulder height, place his feet together, tilt his head back, extend his index fingers, then touch his nose with whichever index finger Beale directed. Beale said that it took defendant several attempts to get into the correct position. Beale first asked defendant to bring his right index finger to his nose. When defendant attempted to do so, he hit the middle of his cheek instead of his nose. When asked to use his left index finger, defendant hit himself in his left eyeball. Beale then asked defendant to use his right index finger again, and defendant hit his nostril. Beale testified that defendant was swaying to the right and to the left approximately three to four inches and was having difficulty standing still. Beale described defendant's balance as poor and said he stopped the test because he did not want defendant to fall.

¶ 53     Beale then told defendant that he would be arrested for DUI. Beale said that defendant was not walking straight as they walked to Beale's squad car. Beale contacted Village police officer Barrett Weadick and asked Weadick to meet him at the police station. Beale wanted Weadick to perform additional field sobriety tests because Beale had been unable to record the tests done at the school and Weadick had more training and experience with drug DUI enforcement. Beale also

asked defendant to submit to a blood test, but defendant declined. Beale said that, in his opinion, defendant was under the influence of drugs.

¶ 54    Officer Weadick testified that he had been a patrol officer with the Village for almost four years. Weadick described his training in detecting people under the influence of cannabis. Weadick testified that, on May 6, 2021, he performed field sobriety tests on defendant in the booking room at the police station. Those tests were video recorded, admitted into evidence, and played for the trial court.

¶ 55    After the video ended, the State asked Weadick if, after conducting the tests, he was able to determine whether defendant was under the influence of cannabis. Weadick replied that he did determine that defendant was under the influence.

¶ 56    On cross-examination, Weadick testified that defendant did not smell like burnt cannabis and that his speech was "[n]ear normal." He never had to ask defendant to repeat himself. Defendant did not need help walking around the police station.

¶ 57    The trial court also examined Weadick. The court asked Weadick what he found significant about defendant's performance during certain portions of his field sobriety testing. As for the modified Romberg balance test, Weadick stated, "the distorted estimation of time[,] the distorted internal clock as [defendant] stopped the 30-second test at 39 seconds and also the very pronounced sway that we saw as he was performing the test." When the trial court asked Weadick what was significant about the finger-to-nose test, Weadick stated:

"[O]nce again, the very pronounced sway, his difficulty understanding the instructions that I gave for it, as well as him missing his touching the tip of his finger to the tip of his nose and then when he confused—when he brought up the incorrect arm when I gave him the instruction for right and left."

The trial court next asked Weadick what was significant about the one-leg-stand test; Weadick replied that defendant leaned to his left and had a sway.

¶ 58    The Village then introduced into evidence a 30-minute video compilation from the high school's security cameras. The video showed defendant walking from the driver's education classroom through various hallways and to the parking lot where the driver's education vehicles were located. The video also showed defendant

driving away from campus and back for his driver's education lesson, then parking the car.

¶ 59    At the close of the Village's case, defendant moved for a directed finding. The trial court denied defendant's motion. Defendant rested without presenting evidence.

¶ 60    The trial court found defendant guilty of DUI (cannabis). The court acknowledged defense counsel's argument that defendant drove poorly simply because he was a novice driver. The court rejected that argument, stating:

> "That could be true to a certain degree. It could also be *** true that it's a novice driver who has—or at that time was under the influence of cannabis. And I think it can also be true that any amount of cannabis could potentially affect the driving of a new driver in a more significant manner than it might a more experienced driver in the same way that different amounts of cannabis affect different people differently, it is also possible that the same amount of cannabis could affect different drivers differently based on their relative experience."

¶ 61    The trial court further noted Peckler's testimony that he initially attributed defendant's poor driving to the fact that he was a young driver. The court stated that, when defendant's driving instruction ended, Peckler was concerned enough to bring defendant's driving to the attention of the school.

¶ 62    The trial court next noted the video from the school that showed defendant walking through various hallways, along with Peckler and another student, to the driver's education vehicle outside. The court observed that defendant was all over the hallways, stumbling back and forth. In addition, the video showed that at one point defendant ran into the lockers and at another point defendant almost hit a table.

¶ 63    The trial court next explained that it found Rogers's testimony to be significant. The court noted that Rogers knew defendant well. Rogers was familiar with how defendant talked and walked and was concerned that defendant was under the influence. The court also pointed out that it had asked Rogers if she could attribute defendant's behavior to his claim that he was up all night. Rogers responded, "no, I think he was under the influence."

¶ 64　　　The trial court concluded:

> "[T]he question for me is whether or not the defendant was under the influence of cannabis to a degree which rendered him incapable of safely driving. I believe he was. I believe [Peckler's] testimony about [defendant's] driving may also have been due somewhat to his [inexperience] but was also due to the cannabis that the defendant had at some point prior to driving that vehicle. I would note that the field sobriety tests conducted at the school, the school resource officer described but also Dean Rogers described that she observed [defendant] nearly falling over and having to put his foot down. What seems to make sense to me is by the time he was at the police station, the effects of the cannabis to a certain degree had dissipated somewhat. Certainly, to where he was able to perform those field sobriety tests better than he did at the school. It may also have been a situation where the police booking room is a more controlled environment, you know, no wind, no weather, better floor, those also could have had some impact. But when I view [defendant] walking through those hallways and one of the officers today said something that something just wasn't right and that's—that's what I observed. There's something about [defendant] that wasn't right. And while I do believe fatigue and emotion could have played some part in that, I believe cannabis also did and did so to a degree which rendered [defendant] incapable of safely driving."

The trial court therefore found that the Village had sustained its burden of proof and found defendant guilty.

¶ 65　　　In this court, defendant argues that the preceding evidence does not show that his driving errors rose to a level sufficient to show that defendant was incapable of driving safely. Defendant claims that Peckler, the only individual who saw and experienced defendant's driving, never testified to anything that would support a conclusion that defendant was incapable of driving safely. Peckler never testified that he felt unsafe while defendant was driving, and at no point did Peckler stop the car and stop defendant from driving. Defendant contends that, because Peckler did not stop defendant from driving, defendant was capable of driving safely. Defendant argues that, even viewed in a light most favorable to the prosecution, the evidence does not support a guilty verdict in this case.

¶ 66 Defendant would have this court consider only the testimony of Peckler in determining whether defendant was proven guilty beyond a reasonable doubt. The standard, however, is whether, after viewing *all* the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. In addition, although Peckler testified that he initially attributed defendant's poor driving to the fact that defendant was a young driver, he became concerned enough by the end of the lesson that he notified the director of the driver's education program that something "was going on."

¶ 67 Rogers testified that defendant's speech was slow, that he was confused, and that he could not respond quickly to questioning. Defendant was walking slowly and was slurring his words. Rogers testified that defendant was not able to maintain his balance during the field sobriety tests at school. Beale also testified that defendant's speech was slurred and that he appeared to be confused. Defendant was not answering questions and could not remember some of the questions he was asked. Beale testified concerning defendant's poor performance on three field sobriety tests performed at school. Beale further stated that defendant was not walking straight as they walked from the school to Beale's squad car. Weadick testified that, after conducting field sobriety tests at the police station, he determined that defendant was under the influence. Weadick described the significant findings from the field sobriety tests for the court. The trial court also described the videotape from the school hallways, observing that defendant was stumbling back and forth. Defendant also ran into the lockers and almost hit a table.

¶ 68 The preceding evidence, when considered with Peckler's testimony, supports a finding that defendant's driving was due to more than mere nervousness or inexperience. Rather, viewing the evidence and testimony in a light most favorable to the State, drawing all reasonable inferences in favor of a finding of guilt, we find the evidence supports a finding beyond a reasonable doubt that defendant was incapable of driving safely. As noted, this court will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of witnesses. *Jones*, 2023 IL 127810, ¶ 28. The evidence was not so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt. For that reason, we find that the appellate court properly affirmed defendant's conviction for DUI.

¶ 69                                  CONCLUSION

¶ 70        For all the foregoing reasons, we affirm the judgment of the appellate court,
which affirmed defendant's conviction.

¶ 71        Judgments affirmed.